The ALEUT CORPORATION et al., Plaintiffs,

v.

**ARCTIC SLOPE REGIONAL CORP. et al., Defendants.**

Civ. No. A75–53.

United States District Court, D. Alaska

April 16, 1976.

William Timme, Fairbanks, Alaska, Arthur Lazarus, Jr., Washington, D. C., for Doyon, Inc.

John Anthony Smith, Gruenberg, Willard & Smith, Anchorage, Alaska, Edward Weinberg, Duncan, Brown, Weinberg & Palmer, Washington, D. C., for Koniag, Inc.

Joseph Rudd, Ely, Guess & Rudd, Anchorage, Alaska, Richard A. Baenen, Wilkinson, Cragun & Barker, Washington, D. C., for Nana Regional Corp., Inc.

Donald J. Beighle, Juneau, Alaska, Richmond F. Allan, Weissbrodt & Weissbrodt, Washington, D. C., Michael M. Holmes, Faulkner, Banfield, Doogan & Holmes, Juneau, Alaska, for Sealaska Corp.

Edward A. Merdes, Merdes, Schaible, Staley & DeLisio, Fairbanks, Alaska, Richard A. Derham & James Wickwire, Davis, Wright, Todd, Riese & Jones, Seattle, Wash., for Arctic Slope Regional Corp., Inc.

Gary Thurlow, Croft & Thurlow, Anchorage, Alaska, Stephen M. Truitt, Wald, Harkrader & Ross, Washington, D. C., for Aleut Corp.

Robert M. Goldberg, Anchorage, Alaska, for AHTNA, Inc.

Barry W. Jackson, Fairbanks, Alaska, for Bering Straits Native Corp.

Eric Treisman, Gen. Counsel, Dillingham, Alaska, James R. Atwood, Covington & Burling, Washington, D. C., for Bristol Bay Native Corp., Inc.

William K. Jermain, Birch, Jermain, Horton & Bittner, Anchorage, Alaska, for Calista Corp.

Joseph P. Josephson, Anchorage, Alaska, Howard S. Trickey, Washington, D. C., for Chugach Natives, Inc.

Allen McGrath, Graham & James, Anchorage, Alaska, for Cook Inlet Region, Inc.

## MEMORANDUM AND ORDER

### VON DER HEYDT, Chief Judge.

This is an action brought by five regional corporations organized pursuant to section 7 of the Alaska Native Claims Settlement Act, 43 U.S.C. §§ 1601–1624 (Supp. I, 1971), against the seven[1] other regional corporations subject to the revenue sharing requirements of section 7(i) of that Act, 43 U.S.C. § 1606(i) (Supp. I, 1971). The plaintiffs seek injunctive and declaratory relief as well as an accounting. Because of the factual and legal complexities involved, the large number of parties, and the existence of numerous crossclaims and counterclaims, the court has identified this case as a complex one within the meaning of section 0.10 of the Manuel for Complex Litigation. The court has jurisdiction of this action under 28 U.S.C. § 1331(a). The case is presently before the court upon the motion for partial summary judgment of Arctic Slope Regional Corporation in accordance with the stipulation entered by all parties on October 28, 1975.[2]

---

1. The thirteenth Regional Corporation is not a party to this action since it specifically is excluded from the sharing provisions of section 7(i).

2. Because of the complex nature of this case the court, in conjunction with all parties to this action, determined that it would be wise to rule on certain preliminary legal questions

The legal issue raised by that motion is whether the revenues received by a regional corporation from timber or a subsurface resource prior to issuance of a patent formally conveying to the regional corporation title to the land on which such timber or such subsurface resource is located are subject to the requirement for mandatory distribution to the other regional corporations under section 7(i), 43 U.S.C. § 1606(i) (Supp. I, 1971), of the Alaska Native Claims Settlement Act (hereinafter ANCSA).

ANCSA was enacted in order to provide a rapid and equitable settlement of the aboriginal land claims of the Natives of Alaska in conformity with the real economic and social needs of the Natives.[3] Under ANCSA the Natives, collectively, will receive title to over forty million acres of public land located in the State of Alaska. From this total, the surface estate on twenty-two million acres will be patented to approximately 220 Alaska Native Village Corporations, with title to the subsurface estate of such land going to the various regional corporations. Additionally, under section 12(c) of ANCSA, the regional corporations are entitled to receive sixteen million acres in which they will own both the surface and subsurface estates. Finally, pursuant to section 14(h) of the Act, Natives, Native groups, and Native corporations will receive patents to a further two million acres for certain statutorily specified purposes.

Section 7(i) of ANSCA provides that, "Seventy per centum of all revenues received by each Regional Corporation from the timber resources and subsurface estate patented to it pursuant to this [chapter] shall be divided annually by the Regional Corporation among all twelve Regional Corporations organized pursuant to this section according to the number of Natives enrolled in each region pursuant to section 1604 of this title. The provisions of this subsection shall not apply to the thirteenth Regional Corporation if organized pursuant to subsection (c) hereof." This section requires that the resource owning corporation share certain revenues with its sister corporations on what approaches a per capita basis. The question presently before the court is whether that distribution requirement is avoided solely for the reason that no patents at this time have been issued to any regional corporation.

While no patents have been issued to the regional corporations and only a very

---

prior to the extensive factual inquiries that ultimately must be made in this action. In conformity with that concept, the present motion is concerned primarily with statutory interpretation.

The court believes it proper to proceed in such a fashion. Undoubtedly, there is a case or controversy in the constitutional sense. There is no feigned dispute in this action. Rather, the dispute is a concrete one involving millions of dollars which is capable of judicial resolution. While it appears that Arctic Slope Regional Corporation is not willing to admit that the monies it has received are subject to 7(i) distribution even if 7(i) applies to pre-patent revenues, several of the other regional corporations appear willing to make that concession. Given that fact, the right of each corporation to demand an accounting from every other corporation, and each corporation's potential liability to its shareholders in a derivative action, the court finds that this action is sufficiently ripe for adjudication. Additional support is given this conclusion by the fact that the relief sought is, in part, declaratory in nature. Finally, the fact that the complexity of this suit mandates such a procedure as well as the fact that any order entered by this court now is interlocutory in nature and subject to modification by the court until a final judgment is entered pursuant to Fed.R.Civ.P. 54(b) or 58, gives credence to the course of action chosen by the court and every party to this action.

3. Unfortunately, the Congressional mandate, that the settlement be accomplished rapidly and without litigation, 43 U.S.C. § 1601(b) (Supp. I, 1971), has not been fulfilled. There are numerous cases before this court involving the interpretation to be given various sections of ANCSA. The court can take judicial notice of the fact that the attorneys' and accountants' fees chargeable to the various Native corporations are a severe burden on their cash flow. It is primarily for this reason that the court has undertaken this attempt to resolve as many questions as is possible, in a judicial context, concerning the meaning and application of section 7(i).

few interim conveyances,[4] a majority of the regional corporations have received very substantial sums in the ostensible form of payments for exploratory rights and options to lease which arguably fall within the ambit of section 7(i). Arctic Slope Regional Corporation (hereinafter Arctic Slope) succinctly contends that no duty to account can arise until after lands are patented to the regional corporations. It argues that the phrase "patented to it" contained in section 7(i) mandates such a result since a patent is a conveyance granting legal title. Therefore, it argues, "The verb form 'to patent', then refers to the act of issuing a patent, and 'patented' refers to lands as to which patents have been issued. Since there are none, there can be no revenues from patented lands and no duty to account." Contending that the phrase "patented to it" is clear and unambiguous, Arctic Slope maintains that there may be no resort to the legislative history of the Act or other parts thereof in order to ascertain the meaning of "patent to it" in the context of the Act as a whole. While it is undoubtedly true, and the cases so hold, that the language of a statute should not be construed where there is no doubt as to its meaning, the words "patented to it" are simply not that clear. The premise of Arctic Slope's entire argument is that the phrase "patented to it" is used to denote a point in time. That is, before the act of patenting no distribution is required, but after such time section 7(i) becomes operative. However, the phrase "patented to it" can also refer to the type of lands subject to section 7(i), rather than the question of *when* such lands come under 7(i).

Revenues from the timber resources and subsurface estate are to be divided annually. Are all revenues from the timber resources and subsurface estate subject to such division? Not necessarily, only those revenues derived from the timber resources and subsurface estate

granted by patent pursuant to the Act in contradistinction to revenues attributable to land independently purchased with, for example, settlement act funds, are subject to 7(i).

When the words "patented to it" are understood to be used in the sense of what type of lands are subject to 7(i) rather than denoting the time that lands come under 7(i)'s formula, they do not require that pre-patent revenues be exempt from 7(i)'s sharing requirement. All of the lands here involved are patented lands in the sense that they are lands that will be acquired by patent pursuant to the Act rather than by purchase. The court finds that to be sufficient for purposes of section 7(i).

That Congress must have intended revenues received by the regional corporations from the timber resources and subsurface estate be subject to prompt sharing is evidenced by section 7(j), 43 U.S.C. § 1606(j) (Supp. I, 1971). That section, immediately following section 7(i), requires that certain distributions be made from 7(i) revenues during the five years immediately following the passage of the Act. Since Congress realized there would be certain delays in the issuance of patents, see 43 U.S.C. § 1621(j) (Supp. I, 1971), it is reasonable to conclude that Congress did not intend the actual issuance of a patent to be critical to the operation of section 7(i). To hold otherwise would mean that Congress engaged in a useless act in writing a large portion of section 7(i). Further, the conference committee did not appear particularly concerned with requiring a patent to pre-date 7(i) revenues. The conference report simply states that, "Each Regional Corporation must divide among all twelve Regional Corporations 70 percent of the mineral revenues received by it." Conference Report No. 92–746, 1971 U.S. Code Congressional and Administrative News, p. 2249. However, the most important reason for rejecting the reading given 7(i) by Arctic Slope is that it

---

**4.** An interim conveyance is an administratively created method for transferring certain interests in land prior to a survey of the land. *See,*

43 C.F.R. § 2650.0–5(h)(i)(j). The court does not decide at this time whether it is the functional and legal equivalent to a patent.

completely nullifies one of the most important sections of the Act.

The bills passed by the House[5] and Senate[6] differed in significant respects in relation to section 7(i). The House bill required that timber and subsurface resources be distributed on a population basis in order that all Natives would share equally in Alaska's wealth.[7] However, the Senate bill provided that only fifty percent of the revenues be redistributed.[8] The conference committee struck a reasonable compromise at seventy percent.[9] Given the obvious egalitarian purpose of section 7(i), the court cannot conceive that Congress intended for tremendous amounts of revenues attributable to the subsurface estate to escape the sharing requirement of 7(i) solely for the reason that such revenues are received prior to patent. Yet this is exactly the result if section 7(i) comes into operation only upon the issuance of a patent to the lands from which the revenues are derived.

That such an interpretation of section 7(i) would be disruptive of the Act and allow large amounts of revenues to escape sharing is evidenced by certain pragmatic considerations. It appears that the process of issuing patents and interim conveyances is nowhere near completion but rather just beginning.[10] During that process millions of dollars are being paid to the regional corporations which are arguably 7(i) revenues. To compound matters, the existence of an escape in section 7(i) as is mandated by Arctic Slope's interpretation of the language, would encourage the resource controlling corporation to devise all sorts of contractual schemes for maximizing its present revenues at the expense of its sister corporations. For example, the resource owning corporation would naturally attempt to receive artificially large bonus payments prior to patent, in conjunction with a proportionately smaller royalty percentage generating revenues subsequent to patent. The ability of the resource controlling corporation to arrange the time of receipt of revenues, taken in conjunction with the interpretation of 7(i) advanced by Arctic Slope, would literally read section 7(i) out of the Act for years to come.

For the aforementioned reasons, the court finds that revenues received from timber resources and the subsurface estate are not excluded from the sharing formula of section 7(i) solely for the reason that they are received prior to the issuance of a patent or interim conveyance to the land from which they are properly attributable to.

Accordingly, IT IS ORDERED:

THAT Arctic Slope's motion for partial summary judgment is denied in conformity herewith.

---

5. H.R. 10367, 92 Cong., 1st session.

6. S. Bill 35, 92 Cong., 1st session.

7. House Report No. 92–523, 1971 U.S. Code Congressional Administrative News, p. 2196.

8. S. Bill 35, section 9j()(*I*), 92 Cong., 1st session.

9. Arctic Slope opposed the revenue sharing formula in its entirety. *See, Hearings on H.R.*

*3100 and Related Bills before the House Subcomm. on Indian Affairs,* 92 Cong., 1st Sess. 304–05 (1971). Given Arctic Slope's geographical location, one can easily understand its opposition to section 7(i).

10. This is the result of a variety of factors such as the need to survey vast amounts of acreage, third-party interests, lack of manpower, and substantial litigation.