The **ALEUT CORPORATION** et al., Plaintiffs,

v.

**ARCTIC SLOPE REGIONAL CORPORATION et al., Defendants.**

**DOYON LIMITED, and Bering Straits Native Corporation, Plaintiffs,**

v.

**Thomas S. KLEPPE, Secretary of the Interior, et al., Defendants.**

Civ. Nos. A75–53, A75–89.

United States District Court,
D. Alaska.

July 19, 1976.

---

See also, D.C., 410 F.Supp. 1196.

Gary M. Thurlow, Croft & Thurlow, Anchorage, Alaska, Stephen M. Truitt, Wald, Harkrader & Ross, Washington, D. C., for The Aleut Corp.

Michael M. Holmes, Faulkner, Banfield, Doogan & Holmes, Donald Beighle, Juneau, Alaska, Richmond F. Allan, Weissbrodt & Weissbrodt, Washington, D. C., for Sealaska Corp.

Milton M. Souter, Kodiak, Alaska, Edward Weinberg, Jay R. Weill, Duncan, Brown, Weinberg & Palmer, Washington, D. C., for Koniag, Inc.

Joe P. Josephson, Anchorage, Alaska, Howard S. Trickey, Washington, D. C., for Chugach Natives, Inc.

Robert M. Goldberg, Anchorage, Alaska, for AHTNA, Inc.

Edward A. Merdes, Merdes, Schaible, Staley & DeLisio, Fairbanks, Alaska, Richard A. Derham, James Wickwire, Davis, Wright, Todd, Riese & Jones, Seattle, Wash., for Arctic Slope Regional Corp.

Barry W. Jackson, Fairbanks, Alaska, for Bering Straits Native Corp.

Eric Treisman, Dillingham, Alaska, James R. Atwood, Covington & Burling, Washington, D. C., for Bristol Bay Native Corp., Inc.

William K. Jermain, Hal R. Horton, Birch, Jermain, Horton & Bittner, Anchorage, Alaska, for Calista Corp.

Allen McGrath, John R. Snodgras, Graham & James, Anchorage, Alaska, for Cook Inlet Region, Inc.

William Timme, Fairbanks, Alaska, Francis J. O'Toole, Arthur Lazarus, Jr., Fried, Frank, Harris, Shriver & Kempelman, Washington, D. C., for Doyon, Ltd.

Joseph Rudd, Ely, Guess & Rudd, Anchorage, Alaska, Richard Baenen, Washington, D. C., for Nana Regional Corp.

G. Kent Edwards, U. S. Atty. for Alaska, Anchorage, Alaska, and John D. Roberts, Asst. U. S. Atty., for Thomas S. Kleppe and William E. Simon.

Ronald H. Bussey, Burr, Pease & Kurtz, Inc., Anchorage, Alaska, for Eklutna, Inc., amicus curiae.

### MEMORANDUM AND ORDER

JAMES A. VON DER HEYDT, Chief Judge.

These actions are before the court on motions for partial summary judgment in No. A75–53 Civil and for summary judgment in No. A75–89 Civil. The two cases were consolidated for the consideration of the motions now before the court since the motions for summary judgment in *Doyon, Ltd. v. Kleppe* raise a legal issue which is virtually identical to that raised by one of the motions for partial summary judgment in *Aleut Corporation v. Arctic Slope Regional Corporation*. Accordingly, this memorandum and order will address the issues in both cases.

Since the court has previously set forth much of the background information involved in *Aleut Corporation v. Arctic Slope Regional Corporation*,[1] those matters will not be reiterated herein. For present purposes, it is sufficient to state that in the *Aleut* case the court is concerned with the interpretation and application of section 7(i) of the Alaska Native Claims Settlement Act, 43 U.S.C. § 1606(i) (Supp. IV, 1974).[2] In that case there are three principal issues now before the court. These are:

1. Does the consideration paid for the right to seek, to lease, to extract a resource from, or to acquire any interest in a subsurface estate constitute revenue under section 7(i) of ANCSA where the resource (a) is not actually found, or (b) is found in a quantity or quality inadequate to market commercially, or (c) where production in fact never occurs by the party paying said consideration, or his successors in interest;

2. (a) Whether the term "all revenues", as used in section 7(i) of ANCSA, includes services, in kind payments, rights, benefits, assistance to third parties, and any other form of nonmonetary consideration; (b) Are such benefits included whether or not the compensation for the resource is affected thereby;

3. Whether the revenues covered by section 7(i) of the ANCSA are to be divided on the basis of the number of "Natives enrolled" in each region or on the basis of the shareholders of each region, thereby excluding from that calculation Natives that have elected to take title to their former reserves pursuant to section 19(b) of the Act. It is this latter question that is at issue in *Doyon, Ltd. v. Kleppe*, except that instead of being concerned with 7(i) revenues, the *Doyon* case involves distributions from the Alaska Native Fund pursuant to section 6(c) of the Act. Accordingly, the court first will address the two issues unique to the *Aleut* case and thereafter consider the enrollment issue that is common to both the *Aleut* and *Doyon* cases.

Section 7(i) provides in relevant part that, "Seventy per centum of all revenues received by each Regional Corporation from the timber resources and subsurface estate . . . shall be divided annually . . . ." With the exception of Arctic Slope Regional Corporation, the eleven oth-

---

1. *See*, 410 F.Supp. 1196 (D.Alaska, 1976).

2. While there were several amendments to the Act in January of 1976, *see*, Pub.L. 94–204, Jan. 2, 1976, 89 Stat. 1145, 43 U.S.C.A. § 1604 et seq. (Supp. 1, March, 1976) they do not directly affect any of the matters now before the court.

er original regional corporations contend that payments made for the right to seek or extract a resource from the subsurface estate, or to acquire any interest therein should be subject to section (i) irrespective of whether the resource is actually found or production actually occurs in fact. In opposition to this contention, Arctic Slope argues[3] that sharing is not required unless the subsurface estate is actually physically diminished; that is, a bonus payment, for example, would not be subject to 7(i) unless actual production occurs. In support of its argument, Arctic Slope urges the court to draw an analogy to the tax treatment of bonus payments relative to the allowance of the cost depletion deduction.

While the parties have spent considerable time and effort in briefing the issue, the court finds it to be rather clear that Arctic Slope's contentions are without merit. The crucial language is "All revenues . . . from the . . . subsurface estate . . . ." As counsel for Bristol Bay Native Corporation puts it, "Subsurface estate, like any estate in real property, constitutes a bundle of rights and not merely a bundle of rocks."

The statutory language is clear and is in no way conflicting with either other sections of the Act or the legislative history thereof. "All revenues" is a broad term. "From the . . . subsurface estate", given a reasonable reading in the context of section 7(i), must mean revenues received because of the acquisition of an interest in the subsurface estate.

■ The court finds Arctic Slope's reliance on the law of cost depletion to lack relevancy for two principal reasons. First, requiring that 7(i) only be triggered upon the actual production of minerals is in conflict with the statutory language. Second, ANCSA is really *sui generis* with goals and

purposes that are vastly different from those underlying the federal tax laws. Accordingly, the court finds that the sharing requirements of section 7(i) do not depend on whether a subsurface resource actually is discovered, produced, or marketed.

■ Turning to the second issue unique to the *Aleut* case, the non-monetary benefits question, it appears that all of the parties agree that as a general principle the term "all revenues" should include benefits of every sort so long as such are received by a regional corporation or third persons in exchange for rights granted in the timber resources and subsurface estate received by a regional corporation pursuant to ANCSA. Judge Gasch has also reached this conclusion.[4] The disagreement appears to be over how such non-monetary benefits are to be valued, problems of proof, and the question of whether a non-monetary benefit can be said to be received because of an acquisition of an interest in the subsurface estate where it is impossible to prove that any monetary benefits received because of such acquisition were affected thereby, that is, are less than they would have been but for the receipt of the non-monetary benefits.

The court agrees that non-monetary benefits received in exchange for the acquisition of an interest in the timber resources or subsurface estate of a regional corporation are indistinguishable from monetary benefits, and fall within the terminology "all revenues" as used in section 7(i). Therefore, the court finds that they are subject to distribution. Additionally, it is of no consequence, for the purposes of section 7(i), that the benefits are paid to third parties so long as they are generated because of, and in exchange for, the acquisition of an interest in the timber resources and subsurface estate received by a regional corporation, pursuant to ANCSA.

---

**3.** Arctic Slope additionally has questioned the propriety of deciding this issue at this time. While the court initially shared Arctic Slope's concern, upon consideration it is apparent that the matter should be decided at this stage of the litigation. The parties have demanded an immediate accounting. This issue, as well as several others closely related, must be decided before a final and complete accounting is possible.

**4.** *Doyon, Limited v. Nana Regional Corporation, Inc.*, Civil No. 1531–74 (D.C.D.C., May 5, 1976).

While valuation and proof of in-kind and indirect benefits will have to await further discovery and/or the appointment of a special master, the court will establish certain general guidelines at this time. It is apparent that non-monetary and indirect benefits should be discouraged in the context of section 7(i) because of the problems that they invite. For that reason and because only the contracting region has control over the types of contracts that it will enter into, the court finds that the revenue controlling corporation will have the burden to prove by a preponderance of the evidence that in-kind or indirect benefits were not received in exchange for or because of the granting of an interest in its timber resources or subsurface estate. Absent such proof, non-monetary and indirect benefits will be considered subject to the sharing requirement of section 7(i).[5] Further, non-monetary benefits will be valued, for the purposes of section 7(i), as the greater of either:

(a) the fair market value of the non-monetary benefit received;

(b) the cost or detriment to the entity furnishing the non-monetary benefit; or

(c) the difference between the royalty or other cash consideration actually received and that which would have been received but for the furnishing of the non-monetary benefit.[6]

The final issue before the court is whether the Natives that have elected to acquire their former reserves pursuant to section 19(b) of the Act, 43 U.S.C. § 1618(b)

(Supp. IV, 1974), should be counted as Natives enrolled in each region for the purposes of computing the percentages used in making distributions under section 7(i) of the Act and section 6(c), 43 U.S.C. § 1605(c) (Supp. IV, 1974). The question is a complex one involving very significant sums of money.[7]

The statutory framework is as follows: [8]

Section 7(i), 43 U.S.C. § 1606(i) (Supp. IV, 1974), "Seventy per centum of all revenues . . . shall be divided annually by the Regional Corporation among all twelve Regional Corporations organized pursuant to this section according to the number of Natives enrolled in each region pursuant to section 1604 of this title."

Section 6(c), 43 U.S.C. § 1605(c) (Supp. IV, 1974), "After completion of the roll prepared pursuant to section 1604 . . . all money in the Fund . . . shall be distributed . . . among the Regional Corporations organized pursuant to section 1606 of this title on the basis of the relative number of Natives enrolled in each region."

Section 5(a) and (b), 43 U.S.C. § 1604(a) and (b) (Supp. IV, 1974), "The Secretary shall prepare within two years from December 18, 1971, a roll of all Natives who were born on or before, and who are living on, December 18, 1971. . . . The roll prepared by the Secretary shall show for each Native . . . the region and the village or other place in which he resided on the date of the 1970 census enumeration, and he shall be enrolled according to such residence."

---

5. The court recognizes that certain types of agreements such as performance guarantees do not give rise to additional 7(i) revenues.

6. If, during the course of this litigation, it appears that these guidelines are causing too great a burden on the liquidity of the various regional corporations the court may reconsider them.

7. In the context of section 6(c) distributions approximately 15.4 million dollars is involved. Further, in relation to section 7(i) distributions, if the 19(b) Natives are counted, Doyon Limited and Bering Straits Regional Corporation stand to gain approximately 16 million dollars per billion distributable under section 7(i).

8. The "Natives enrolled" language is also used in section 12(b), 43 U.S.C. § 1611(b) (Supp. IV, 1974). That section provides in relevant part, "The difference between twenty-two million acres and the total acreage selected by Village Corporations pursuant to subsection (a) of this section shall be allocated by the Secretary among the eleven Regional Corporations . . . on the basis of the number of Natives enrolled in each region." However, that section is not now before the court and presumably will never be as the action of the Secretary is specifically excluded from judicial review.

Section 19(b), 43 U.S.C. § 1618(b) (Supp. IV, 1974), "Notwithstanding any other provision of law . . . any Village Corporation . . . may elect within two years to acquire title to the surface and subsurface estates in any reserve set aside for the use or benefit of its stockholders or members prior to December 18, 1971. . . The Secretary shall convey the land to the Village Corporation . . . and the Village Corporation shall not be eligible for any other land selections under this chapter or to any distribution of Regional Corporation funds pursuant to section 1606 of this title, and the enrolled residents of the Village Corporation shall not be eligible to receive Regional Corporation stock."

In the *Doyon* case the Secretary of the Interior has determined that the Natives enrolled in villages that elected to exclude themselves from certain provisions of ANCSA pursuant to section 19(b), in exchange for receiving title to their former reserves, should not be counted for the purposes of section 6(c).[9] No such determination has been made in regard to section 7(i) since the Secretary is not involved in distributions pursuant to that section. Since the matter is purely one of statutory interpretation the court, while giving some deference to the Secretary's decision, must examine the matter on its own merits.

While the language of the sections is clear and would require that 19(b) Natives be counted for the purposes of sections 6(c) and 7(i), the court has the authority and the duty to examine the legislative history of ANCSA and the other sections of that Act. *Train v. Colorado Public Interest Research Group, Inc.,* —— U.S. ——, 96 S.Ct. 1938, 48 L.Ed.2d 434, 44 U.S.L.W. 4717 (1976). Neither the legislative history of the Act nor the other sections thereof convince the court that Congress misspoke when it used the terminology "Natives enrolled in each region."

The strongest arguments of those opposing the position of Doyon and Bering Straits are first that Congress attempted to create equality in the operation of the provisions of ANCSA where that was feasible; second, that section 7(j), 43 U.S.C. 1606(j) (Supp. IV, 1974) establishes that the Regional Corporations receive 6(c) and 7(i) monies for the benefit of their shareholders and villages within their respective regions that have not made section 19(b) elections; and, finally, that by making such elections the villages disenrolled their members from the Regional Corporations.[10] While the court has carefully considered all three contentions, problems exist with each of them. As to the equality argument, it is sufficient to say that ANCSA cannot and does not create precise equality. There are simply too many variables. The section 7(j) contention shows no more than the fact that certain monies are to filter down to the individual shareholders and to the Village Corporations. This in no way detracts from the fact that ANCSA was designed to create a strong and viable Regional Corporation structure that possibly could have been severely weakened in one or more Regions had more villages made the section 19(b) elections. Finally, the disenrollment argument suffers fatally because of the lack of any statutory support and the specific reference in Section 6(c) to the actual roll prepared pursuant to section 5(a) and (b).

The Alaska Native Claims Settlement Act is complex legislation. Obviously, it is possible that Congress made certain errors and omissions in its enactment. However, Congress utilized the terminology "Natives enrolled in each region" repeatedly. Addi-

---

**9.** Six villages have made the 19(b) election. These are Tetlin, Venetie and Arctic Village in the Doyon Region, and Elim, Gambell and Savoonga in the Bering Straits Region.

**10.** Those opposing Doyon and Bering Straits have cited the court to one provision in the House Report that does support their position. It provides that "Each corporation must share its mineral revenues with the other 11 corpora-

tions on the basis of the relative number of stockholders in each region." H.Rep. No. 92-523, 92d Cong. 1st Sess., 6 (1971), 1971 U.S. Code Cong. & Admin.News, Vol. 2, p. 2196. However, the court is constrained to find that this one item of legislative history is not entitled to much weight in view of the repeated use of the term "Natives enrolled" throughout the Act itself.

tionally, it used "stockholder" language often when that was appropriate. The court is unwilling to find that Congress confused the two terms.

When Congress passed ANCSA in 1971 it could not and did not know which villages would elect to acquire title to their former reserves pursuant to section 19(b). If none had so elected, precise mathematical equality would exist between the Regional Corporations for the purposes of sections 7(i) and 6(c). Such was not the result. The percentages favor slightly Doyon and Bering Straits when considered on a per capita basis, based on the number of stockholders in each region. Whether Congress intended this is not clear. Perhaps it did. Perhaps Congress was concerned that so many villages would elect under 19(b) within a given region that such a region would have its existence as a viable corporate entity threatened. Given an uncertain Congressional purpose, clear statutory language, and the fact that the members of section 19(b) villages are still within the framework of ANCSA,[11] the court finds that the Natives that are enrolled in villages that elected to take title to their former reserves pursuant to section 19(b) are natives enrolled in the regions of Doyon and Bering Straits for the purposes of section 6(c) and 7(i).

Accordingly, IT IS ORDERED:

1. THAT in the case of *Aleut Corporation v. Arctic Slope Regional Corporation*, Civ. No. A75–53, the motions for partial summary judgment are granted and denied in conformity herewith;

2. THAT in the case of *Doyon, Limited v. Kleppe*, Civ. No. A75–89, the motion of Doyon and Bering Straits for summary judgment is granted and the cross motions for summary judgment are denied.

3. THAT in the case of *Doyon, Limited v. Kleppe*, Civ. No. A75–89, counsel for Doyon shall prepare and submit an appropriate final judgment form that evidences thereon the signatures of one counsel for each party in A75–89 and that reflects any comments that each may have in regard to the entry of a final judgment in A75–89.

11. Compare section 19(b) villages with 19(a) villages.