The ALEUT CORPORATION et
al., Plaintiffs,

v.

ARCTIC SLOPE REGIONAL CORPORA-
TION et al., Defendants.

Civ. No. A–75–53.

United States District Court,
D. Alaska.

Feb. 7, 1980.

Douglas F. Strandberg, Sourant &
Strandberg, Anchorage, Alaska, Stephen

Truitt, Wald, Harkrader & Ross, Washington, D. C., for Aleut Corp.

Michael M. Holmes, Juneau, Alaska, Richmond F. Allan, Weissbrodt, & Weissbrodt, Washington, D. C., for Sealaska Corp.

Dan A. Hensley, Duncan, Weinberg, Palmer & Miller, Anchorage, Alaska, Gerald Markham, Kodiak, Alaska, Edward Weinberg, Jay Weill, Duncan, Brown, Weinberg & Palmer, Washington, D. C., for Koniag.

David Walsh, Moderow & Walsh, Anchorage, Alaska, for Chugach Natives Inc.

Robert M. Goldberg, Anchorage, Alaska, for Ahtna, Inc.

Stephen S. DeLisio, Merdes, Schaible, Staley & DeLisio, Anchorage, Alaska, Richard A. Derham, Davis, Wright, Todd, Riese & Jones, Seattle, Wash., for Arctic Slope Regional Corp.

Steven S. Bell, Perkins, Coie Stone, Olsen & Williams, Anchorage, Alaska, for Bering Straits Native Corp.

Elizabeth Johnson, Thomas Gingras, Anchorage, Alaska, Brice M. Clagett, Washington, D. C., for Bristol Bay Native Corp.

Hal R. Horton, Birch, Horton, Bittner, Monroe, Pestinger & Anderson, Anchorage, Alaska, for Calista Corp.

Allen McGrath, Graham & James, Anchorage, Alaska, Joyce Bamberger, Anchorage, Alaska, for Cook Inlet Region, Inc.

Elizabeth S. Taylor, Wm. Timme, Fairbanks, Alaska, Arthur Lazarus, Washington, D. C., for Doyon, Ltd.

Terry Fleischer, Ely, Guess & Rudd, Anchorage, Alaska, Richard Baenen, Wilkinson, Cragun & Barker, Washington, D. C., for Nana Regional Corp., Inc.

## MEMORANDUM AND ORDER

VON DER HEYDT, District Judge.

THIS CAUSE comes before the court on the motion of the Steering Committee [1] for partial summary judgment on the applicability of section 7(i) of the Alaska Native Claims Settlement Act (ANCSA), 43 U.S.C. § 1606(i) (1976), to over $13,000,000 in revenues received by the Arctic Slope Regional Corporation [hereinafter Arctic Slope] under agreements with five major oil companies.

As a part of the settlement of the aboriginal claims of Alaska's Natives, Congress required that a regional corporation, authorized by ANCSA, receiving revenues from certain sources of wealth share those revenues with its sister corporations. Section 7(i) provides:

> Seventy per centum of all revenues received by each Regional Corporation from the timber resources and subsurface estate patented to it pursuant to this chapter shall be divided annually by the Regional Corporation among all twelve Regional Corporations organized pursuant to this section according to the number of Natives enrolled in each region pursuant to section 1604 of this title. The provisions of this subsection shall not apply to the thirteenth Regional Corporation if organized pursuant to subsection (c) hereof.

§ 7(i), ANCSA, 43 U.S.C. § 1606(i) (1976) [hereinafter referred to as section 7(i)]. The almost deceptive simplicity of this section has caused this litigation which is now at the end of its fifth year.[2]

In conformity with ANCSA, Arctic Slope has received interim conveyances to the subsurface estate of approximately 3,785,200 acres of land located on the North Slope of Alaska. Beginning in 1973, Arctic Slope entered into four agreements with five oil

---

1. The court previously has identified this case as complex within the meaning of section 0.10 of the Manual for Complex Litigation. For the purpose of this motion the Steering Committee represents Ahtna, Inc., Aleut Corp., Koniag, Inc., Sealaska Corp., Cook Inlet Region, Inc. and Doyon, Ltd.

2. Both this court and the Ninth Circuit Court of Appeals have issued previous opinions in this case. *Aleut Corp. v. Arctic Slope Regional Corp.*, 410 F.Supp. 1196 (D.Alaska 1976); 417 F.Supp. 900 (D.Alaska 1976) *rev'd in part sub nom. Doyon, Ltd. v. Bristol Bay Native Corp.*, 569 F.2d 491 (9th Cir. 1978); 421 F.Supp. 862 (D.Alaska 1976) *aff'd in part and rev'd in part sub. nom. Chugach Natives, Inc. v. Doyon, Ltd.*, 588 F.2d 723 (9th Cir. 1978).

companies.[3] Under these agreements Arctic Slope received approximately $30 million. In return the oil companies received ultimately the right to extract oil and gas from the subsurface estate conveyed to Arctic Slope. Arctic Slope contends that $13,911,057 of the revenues received under these agreements are not subsurface revenues within the meaning of section 7(i) and therefore do not have to be shared with the other regional corporations. Arctic Slope contends that these revenues were not paid for oil and gas but were consideration for a variety of other services and property interests independent of the subsurface estate. The Steering Committee, however, maintains that as a matter of law the revenues received under these agreements are revenues attributable to the subsurface estate and that the allocations by Arctic Slope to other services and property interests are mere "labels" that do not represent valid separate consideration in the context of these agreements.

*Material Facts*

Arctic Slope argues that this decision is not ripe for summary judgment because many facts exist that are disputed. The court has carefully reviewed the agreements, depositions, affidavits and the entire record relevant to this motion and agrees with the moving parties that while there are numerous facts that are in dispute, those facts are not material to this motion.

It is not every uncertainty or dispute or every failure of the parties to agree, which precludes the disposition of a case by summary judgment. Where the determinative facts are without dispute or are clearly established by the record so that one of the parties is shown to be entitled to judgment as a matter of law, it is the duty of the Court to grant summary judgment accordingly; this notwithstanding that there may be a dispute as to immaterial points.

**3.** The four agreements are with (1) Standard Oil Company of California, (2) Union Oil Company of California and Amoco Production Company, jointly, (3) Texaco, Inc., and (4) Shell Oil Company.

*Burton v. United States,* 139 F.Supp. 121, 124 (D.Utah 1956). *Accord: Ashcroft v. Paper Mate Mfg. Co.,* 434 F.2d 910 (9th Cir. 1970); *Proler Steel Corp. v. Luria Bros. & Co.,* 417 F.2d 272 (9th Cir. 1969).

The court finds no genuine issue as to three material facts which determine whether these revenues are covered by the sharing provisions of section 7(i).[4] Those facts are:

1. No matter how each agreement was structured and no matter how the payments were allocated by the language of the agreement, the ultimate object, or as the Steering Committee urges, "the bottom line", of all the agreements was to give the oil companies the right to explore for and develop oil and gas resources on Arctic Slope land conveyed under ANCSA.

2. The oil company negotiators considered each agreement as a single contract package with the object being the exploration for and development of oil and gas. Arctic Slope does not contend, nor could it, that the oil companies would have been interested in these contracts if they had not included the right to explore for and develop oil and gas.

3. At the beginning of each negotiation the oil companies offered a cash bonus for a contract that would grant the right to explore for and develop oil and gas. At the conclusion of the negotiations the same amount of money was paid for a contract that recited that the cash was not a bonus for oil and gas and allocated the payments to other elements of consideration. As the Steering Committee states, "Only the labels changed, not the dollars."

*General Principles*

This court has previously interpreted section 7(i) broadly so as to further the section's "obvious egalitarian purpose." *Aleut v. Arctic Slope Regional Corp.,* 410 F.Supp. 1196, 1200 (D.Alaska 1976). *Accord: Chu-*

**4.** The four agreements were negotiated separately and are not identical. However, the facts listed as material are common to all of them.

gach Natives, Inc. v. Doyon, Ltd., 588 F.2d 723, 732 (9th Cir. 1978) [Section 7(i) was intended to achieve rough equality in assets among all the Natives]. This court also has recognized that it must avoid interpretations which "would encourage the resource controlling corporation to devise all sorts of contractual schemes for maximizing its present revenues at the expense of its sister corporations." 410 F.Supp. at 1200. This court has previously ruled that "the sharing requirements of section 7(i) do not depend on whether a subsurface resource actually is discovered, produced, or marketed." 417 F.Supp. 900, 903 (D.Alaska 1976). In that same opinion the court stated that the test to be applied in determining whether benefits paid to third parties were revenues subject to the sharing requirements of section 7(i) was whether the benefits were "generated because of, and in exchange for, the acquisition of an interest in the timber resources and subsurface estate received by a regional corporation, pursuant to ANC-SA." 417 F.Supp. at 903. Because the contracting region has control over the types of contracts that it will enter into, it was also held that the contracting region should have the burden of proving in kind or indirect benefits were not received in exchange for or because of the granting of an interest in timber resources or subsurface estate. 417 Supp. at 904.

In applying these general principles to the revenues received under the agreements before the court, it is necessary to develop additional specific rules for determining what revenues received by a regional corporation must be shared with the other regional corporations. These rules will further the important purpose of section 7(i) and aid in assuring that the resource wealth of Alaska's Native corporations will be distributed so as to benefit all of Alaska's Native peoples. In order to accomplish this general egalitarian purpose, the rules adopted are intended to reduce the opportunity and thereby the incentive for resource-controlling regional corporations to devise methods for retaining revenues that were intended by Congress to be shared by all the regional corporations. The purpose of these rules is to reduce the need for future litigation by providing guidance to the regional corporations.[5]

First, revenues received by a regional corporation that are attributable to, directly related to, or generated by the acquisition of an interest in the corporation's subsurface estate are revenues subject to the sharing provisions of section 7(i).[6]

Second, revenues received under an agreement, or a group of agreements that are regarded as one transaction, which has as its ultimate object the acquisition of an interest in the subsurface estate will be presumed to be attributable to, directly related to, and generated by the acquisition of an interest in the corporation's subsurface estate. The contracting corporation has the burden to rebut this presumption. It can

5. This court agrees with the statement contained in a recent law review article:

    Two years of studying ANCSA provide one with a dominant impression: all the litigation ANCSA is generating must stop. It exacts both high financial and psychological costs. It exacerbates friction that exists between Natives and non-Natives and among Natives themselves. As many a wise lawyer has observed, in most cases, no matter what the result, no one really wins after litigation has taken its toll.

Branson, Square. Pegs in Round Holes: Alaska Native Claims Settlement Corporations Under Corporate Law, 8 UCLA–Alaska L.Rev. 103, 137 (1979).

6. Arctic Slope has contended that the issue of whether the subsurface estate is coextensive with the mineral estate or is narrower is presented for decision by this motion. The court does not find that any party disputes that oil and gas are a part of the subsurface estate and therefore it does not find that issue to be presented. See generally Chugach Natives, Inc. v. Doyon, Inc., 588 F.2d 723, 726–729 (9th Cir. 1978). Assuming that oil and gas are a part of the subsurface estate, the court is not required to define "subsurface estate" in order to hold that as a matter of law under section 7(i), revenues received by a regional corporation which are attributable to, directly related to, or generated by an oil and gas lease are revenues received from the subsurface estate and therefore subject to the sharing provisions of section 7(i).

do so by proving by a preponderance of the evidence that the revenues received by it under such an agreement are for elements of consideration that are owned by the corporation, that the consideration has actual value, and that this value is not attributable to, directly related to, nor generated by the acquisition of an interest in the corporation's subsurface estate.

This rebuttable presumption and the shift in burden which it causes is justified because the contracting corporation has control over the types of contracts into which it enters. It is improbable that the revenues received under an agreement granting an interest in the subsurface estate are not attributable to the subsurface estate. "The risk of failure of proof may be placed upon the party who contends that the more unusual event has occurred." McCormick on Evidence § 337 (1972) at 787. This shift in burden is also necessary to enforce the egalitarian purpose behind section 7(i) because the contracting corporation has strong financial incentives to obscure the true nature of the transaction.

■ Third, the allocation of revenues to a particular element of consideration by the parties to an agreement does not determine whether the revenues received by the regional corporation are subject to sharing under section 7(i). The court must examine the claimed elements of consideration to determine whether they have substance. However, any allocations not made clear on the face of the contract will not be considered by the court. The contracting corporation must be held to the contract that it made and cannot be allowed to proffer to the court numerous after the fact explanations as to why the revenues were received. By insisting that reasonable allocations be made clear in the contract, the court can simplify future litigation over the distribution of section 7(i) revenues. Failure to allocate will eliminate after the fact rationalizations, but a label in the contract will not prevent the court from piercing transparent schemes to retain revenues that are attributable to the subsurface estate.

The presumption that the revenues received under these agreements are section 7(i) revenues applies to these agreements. There is no genuine issue of material fact that these agreements convey to the oil companies an ultimate right to acquire an interest in the subsurface estate of lands received by Arctic Slope from the federal government. The court must now examine the claimed elements of consideration to determine whether they have substance.

Compensation for Damage to the Surface Resources and the Subsistence Lifestyle of Arctic Slope Natives

Arctic Slope has made several related arguments contending that a portion of these contested revenues are compensation for damages to surface resources that will be caused by oil and gas exploration and development activities. Arctic Slope claims that revenues were received from the oil companies for 1) reasonable damages to the surface, 2) liquidated damages for unreasonable damage to the surface, and 3) compensation for indirect damage to the subsistence lifestyle and culture of Arctic Slope shareholders.

■ An oil and gas lease carries with it the right to use as much of the surface as may be reasonably necessary to exploit the oil and gas. See generally, W. L. Summers, Oil and Gas § 652 and cases cited therein. Any revenues received for reasonable damage to the surface are attributable to, directly related to, and generated by the acquisition of an interest in the subsurface estate.

■ Arctic Slope contends that at least a portion of these revenues are liquidated damages for unreasonable damage to the surface resources. The court agrees with Arctic Slope that revenues received under a valid liquidated damage clause for unreasonable damage to the surface would not be revenues attributable to the subsurface estate. The surface of Arctic Slope land has real value that could easily be shown not to be attributable to oil and gas development or any other subsurface interest. However, this argument has no relevance to the agreements before the court.

None of the agreements contain a clause which even resembles a liquidated damages clause. Nor is there a provision which waives any right of Arctic Slope to recover for damage to the surface. On the contrary, the leases that would be acquired under these agreements provide that:

> Lessee shall pay for damages caused by Lessee's operations to their existing improvements and any trees or vegetation, and also to gravesites and historical sites of which Lessee has been advised in writing by Lessor. . . .

Chevron Oil and Gas Lease, p. 15, ¶ 10; Union/Amoco Oil and Gas Lease p. 16, ¶ 10; Texaco Oil and Gas Lease p. 16, ¶ 10; Shell Oil and Gas Lease p. 23, ¶ X. These agreements are highly technical integrated contracts drawn by skilled attorneys. A reasonable person simply could not believe that such an allegedly important element of consideration would not be stated in the agreements in a manner to leave no doubt about its existence. In addition, the oil companies would not have paid a substantial amount as liquidated damages for unreasonable damage to the surface without receiving in return a waiver of liability for such damages, at least in the amount paid as liquidated damages. But as noted above, no provisions of this kind can be found in the agreements.

This leads the court to the inescapable conclusion that this argument is an after the fact rationalization and that Arctic Slope could not have received any portion of these revenues as liquidated damages for unreasonable damage to the surface estate. This claim by Arctic Slope can be rejected on the ground that the allocation of revenues to this element of consideration is foreclosed by the face of the agreements.

Each of the agreements contains references to the subsistence lifestyle of Arctic Slope shareholders such as that which appears in the lease option agreement with Standard Oil of California:

> Such initial Cash Option Payment and such Additional Cash Option Payment, collectively, are intended and shall be treated and considered as consideration for granting of this option agreement to Standard and to induce ASRC to grant this option agreement in the light of the possible changes and effect which operations by Standard under leases granted hereunder may produce in the historical life style, occupational patterns and general characteristics of the community life of the Native shareholders of ASRC, and shall not be treated or considered as bonus consideration for any oil and gas lease which Standard may elect to obtain from ASRC covering any ASRC lands or as rental for any period under any such oil and gas lease.

Exhibit B, Lease Option Agreement at 2 (Standard Oil of California); *See also* Exhibit C, Exploratory and Development Agreement at 3 (Union Oil/Amoco); Exhibit D, Exploratory and Development Agreement at 3 (Texaco); Exhibit E, Exploratory and Development Agreement at 8 (Shell).

As the court previously has stated, the allocation of these revenues to a particular element of consideration, or the labels placed upon the consideration by the parties to the agreement, do not control the determination of whether these revenues are subject to section 7(i) sharing. The court must examine the allocations made by the contracting parties to determine whether they have substance.

The Arctic Slope Regional Corporation is a for-profit corporation organized under Alaska law. 43 U.S.C. § 1606(d). Assuming without deciding that the Native shareholders would have a claim against the oil companies for damage to their subsistence lifestyle and culture, these interests are not held by the regional corporation. It is hornbook law that corporations are legal persons distinct from their shareholders.[7] While the extent to which Native corporations differ from any other corporation organized under Alaska law has not been definitely decided,[8] this court does not ac-

---

7. H. G. Henn, Handbook of the Law of Corporations § 69 at 93 (2nd ed. 1970).

8. *See* Branson, *Square Pegs in Round Holes: Alaska Native Claims Settlement Corporations*

cept the proposition that the interests of individual shareholders are the same as the interests of the corporation. Arctic Slope's contention that the corporation could receive compensation for damage to the subsistence and cultural interests of its individual shareholders necessarily implies that the corporation has the power to waive claims for such damages. Arctic Slope has not indicated the source of such authority.

It is true that Arctic Slope's articles of incorporation state that one of its purposes is to "engage in all activities, whether economic, cultural, social or charitable, to protect and preserve the wellbeing of the Natives of the Arctic Slope Region." Art. III, § 3. It could be that a Native regional corporation has a special obligation, above and beyond its profit-making mission, to insure that its activities do not destroy or damage the culture and subsistence lifestyle of the people of the region. That question is not decided here. However, Arctic Slope's argument that it must protect the subsistence resources of its region and the culture of its people confuses fiduciary obligations with the acquisition of a compensable interest in such resources and culture. In summary, whether the court analyzes Arctic Slope's contentions concerning damage to the environment as compensation for reasonable surface damage, liquidated damages for unreasonable surface damage, or compensation for damage to subsistence and culture, the elements of consideration claimed by Arctic Slope are inadequate as a matter of law.

*Services and Alleged Surface Interests Related to Oil and Gas Exploration and Development*

Arctic Slope claims a portion of these revenues were for services and alleged surface interests. It contends that the oil companies paid for 1) assistance in obtaining

permission from the Secretary of Interior to enter upon lands withdrawn for Native corporation selection, 2) consent by Arctic Slope to explore lands withdrawn for Native selection, 3) assistance in obtaining village consent to enter village lands, and 4) surface rentals for easements on Arctic Slope lands necessary to carry out the purposes of any leases acquired by the oil companies.

Each of these alleged elements of consideration was a part of the total package the oil companies purchased in order to gain the effective right to explore for and develop oil and gas. The oil companies would not have made payments to Arctic Slope for these services and surface rights unless they acquired in the same agreement, or group of agreements, the right to acquire oil and gas. Arctic Slope cannot seriously contend that it could sell oil and gas leases for millions of dollars and then deny permission to the lessees to go on the surface to explore for and develop that oil and gas. Whatever independent value these alleged elements of consideration have, Arctic Slope has brought forth no evidence that would illustrate that the revenues received for these services and other interests were not attributable to, directly related to, nor generated by acquisition of an interest in the subsurface estate.

*Lease Options*

In an appendix the court has reprinted Arctic Slope's "lease option." These so-called "lease options", which were a part of all four agreements, constitute one of the best examples of the type of legal device to which the court alluded when it referred to "contractual schemes for maximizing its present revenues at the expense of its sister corporations." *Aleut Corp. v. Arctic Slope Regional Corp.*, 410 F.Supp. 1196, 1200 (D.Alaska 1976).[9]

*Under Corporate Law*, 8 UCLA–Alaska L.Rev. 103 (1979).

**9.** During oral argument counsel for the Steering Committee was very candid in his description of "lease options":

> Finally, we get to these so-called lease options. Every time I think about lease op-

tions, the word that comes to my mind is "fraud," but fraud has a special connotation in the law, so I won't use it. Let's say it is a sham. It is a deceit. It is a fiction. It is a flim-flam. There are no options. There are cash payments that are called options, but there are no options. Arctic Slope's own example showed the difference between a

For example, close examination of the "lease option" in the Standard Oil of California agreement shows that Standard is obligated to pay an initial payment of $1.5 million. Thirty days after notice that Arctic Slope has received conveyance of 1.5 million acres of land, Standard must pay an additional one million dollars. This additional cash payment "shall be due and payable in cash from Standard to ASRC on the date specified above *regardless of whether Standard has theretofore exercised its option under this agreement to obtain any oil and gas lease on any ASRC lands."* (emphasis added). By this language Standard is obligated to pay the entire amount whether it exercises its "option" or not. Therefore the face of this so-called "option" establishes it not to be a true option at all, but a sale of the right to acquire oil and gas. Revenues received for these "lease options" are revenues received from the subsurface estate as a matter of law.

*Joint Acquisition Agreement*

The Standard Oil of California Agreement contains a unique provision that does not require extended comment. The agreement states that Standard Oil of California paid $1.5 million for Arctic Slope's entry into an agreement that if either corporation acquired an oil and gas lease on certain lands not conveyed under ANCSA, the other party would be offered an interest in the lease on the basis of 80% for Standard Oil of California and 20% for Arctic Slope, with the oil company to bear all exploration and development costs. The benefits under this agreement flow from Standard Oil of California to Arctic Slope. The Steering Committee contends that the oil company would not have paid $1.5 million for the right to spend additional sums to benefit Arctic Slope. The court finds merit in this argument.

The court having examined the briefs, depositions, affidavits and exhibits, finds that there are no genuine issues of material fact, and the revenues received under these four agreements are revenues received from the subsurface estate as a matter of law and are subject to the sharing provisions of section 7(i) of ANCSA.

Accordingly IT IS ORDERED:

THAT the motion of the Steering Committee for partial summary judgment is granted.

## APPENDIX

LEASE OPTION IN EXPLORATORY AND JOINT ACQUISITION AGREEMENT BETWEEN STANDARD OIL OF CALIFORNIA AND ARCTIC SLOPE REGIONAL CORPORATION, STEERING COMMITTEE'S EXHIBIT A

WHEREAS Standard desires a first and prior right and option to acquire oil and gas leases on some of the withdrawn lands which are selected and become ASRC lands and ASRC is willing to grant such first and prior right and option upon the terms and conditions contained in this agreement.

---

real option and what Arctic Slope did. The example they gave as the fair market bonus on an oil and gas lease would be $100,000. If you wanted that oil and gas lease now, you would pay $100,000 for it. If you don't want that oil and gas lease, then you pay $10,000 for an option to get that oil and gas lease anytime within the next five years upon payment of $100,000. That is an option. But that is not what happened here. What Arctic Slope did was take the $100,000 of a bonus and it changed the label, and it called it an option, but the oil company still had to pay the $100,000. There wasn't a dime more. There wasn't any of that $10,000 in there. The oil company paid the same $100,000. Then, if you look down, you see that they have to exercise the option. Now, "option," I thought, meant "choice," but the oil company didn't have a choice. They had to pay everything down, and if they didn't exercise the option, they had to pay for it, anyway. So what we have here is a label without the substance. We took the "bonus" and we called it an "option," and we didn't change the cash one iota. We didn't change the relationship of the parties one iota. We just took a label that we thought we could get away with. We really don't have to dwell on this too much because, even if it were a legitimate option, which it is not, the law is quite clear that an option creates an interest in the subsurface estate. Therefore, any payment for an option is a payment for an interest in the subsurface estate.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties do hereby agree as follows:

1. *GRANT OF OPTION*

For and in consideration of One Million Five Hundred Thousand Dollars ($1,500,-000.00) (the "Initial Cash Option Payment") which is being paid in cash by Standard to ASRC incident to execution and delivery of this Lease Option Agreement and the additional sum of One Million Dollars ($1,000,-000.00) (the "Additional Cash Option Payment") to be paid in cash hereafter by Standard to ASRC as hereinafter provided, and subject to and in accordance with all of the terms, conditions, exceptions and provisions of this agreement ASRC hereby grants to Standard a first and prior right and option to acquire oil and gas leases on up to 2,000,000 acres of ASRC lands. The Additional Cash Option Payment shall be paid by Standard to ASRC within thirty (30) days after Standard receives notice in writing from ASRC that ASRC has received a "conveyance of title" (as hereinafter defined) for an aggregate of at least 1,500,000 acres of ASRC lands (exclusive of lands depicted in pink in Exhibits "A" and "B" hereto). Such Initial Cash Option Payment and such Additional Cash Option Payment, collectively, are intended and shall be treated and considered as consideration for granting of this option agreement to Standard and to induce ASRC to grant this option agreement in the light of the possible changes and effect which operations by Standard under leases granted hereunder may produce in the historical life style, occupational patterns and general characteristics of the community life of the Native shareholders of ASRC, and shall not be treated or considered as bonus consideration for any oil and gas lease which Standard may elect to obtain from ASRC covering any ASRC lands or as rental for any period under any such oil and gas lease. Said Additional Cash Option Payment shall be due and payable in cash from Standard to ASRC on the date specified above regardless of whether Standard has theretofore exercised its option under this agreement to obtain any oil and gas lease on any ASRC lands. ASRC shall be entitled to retain both said Initial Cash Option Payment and said Additional Cash Option Payment regardless of whether Standard exercises its option hereunder to obtain any oil and gas lease on any ASRC land.