CAPE FOX CORPORATION, Plaintiff,

v.

UNITED STATES of America, Earl L. Butz, Secretary of Agriculture, John R. McGuire, Chief, Forest Service, John Sandor, Regional Forester, James Watson, Forest Supervisor, Thomas S. Kleppe, Secretary of Interior, Department of Interior, Curtis V. McVee, State Director, Bureau of Land Management, Robert Sorenson, Director of Lands and Mineral Operations, Bureau of Land Management, Alaska Timber Corporation, Ketchikan Pulp Company, Revilla Logging, Defendants.

Civ. No. K 76–1.

United States District Court,
D. Alaska.

Aug. 4, 1978.

Peter R. Ellis, Ellis, Sund & Whittaker, Ketchikan, Alaska, Cathy V. Canorro, Ellis, Sund & Whittaker, Ketchikan, Alaska, for plaintiff.

Alexander O. Bryner, U. S. Atty., Milton L. Moss., Asst. U. S. Atty., Anchorage, Alaska, Cynthia Pickering, Anchorage, Alaska, Gary B. Randall, Lands & Natural Resources Div., U. S. Dept. of Justice, Washington, D.C., for Federal defendants.

John W. Peterson, Zeigler, Cloudy, Smith, King & Brown, Ketchikan, Alaska, for defendants, Ketchikan Pulp Co., and Alaska Timber Corp.

## ORDER

FITZGERALD, District Judge.

This case is here on cross motions for summary judgment.

The parties have by pre-trial order adopted the following stipulation of facts:

"1. On October 17, 1969, the United States entered into the Devil's Club No. 2 Timber Sale Contract, (herein- after cited as "Contract"), with the contract retroactive to June 26, 1969. The contract provided for Annette Timber Corporation, later known as Alaska Timber Corporation (hereinafter cited as ATC), to harvest 43,- 600,000 board feet of timber for the Tongass National Forest by December 31, 1974 under standard Forest Service procedures.

2. The Alaska Native Claims Settlement Act (hereinafter cited as ANCSA) was passed on December 18, 1971. Plaintiff Cape Fox Corporation (hereinafter cited as Cape Fox), a village corporation was organized under 43 U.S.C. 1607 and is eligible to select land under 43 U.S.C. 1615, and receive benefits under ANCSA.

3. By contract dated April 27, 1973, defendant Ketchikan Pulp Company (hereinafter cited as KPC), assumed performance of the contract as ATC's purchasers representative. In return, KPC was to and did receive all lumber harvested.

4. ATC is an Alaska corporation with its principal place of business in Alaska.

5. KPC is a corporation with its principal place of business in Alaska.

6. Until 1974, there were no operations under the contract.

7. On April 19, 1973, before formation of Cape Fox, the Forest Service advised Sealaska Corporation about the contract. There was no indication of Native opposition.

8. On April 24, 1974, the Forest Service informed ATC that the contract expired on December 31, 1974, and that it might not qualify for an extension.

9. Subsequent to the notification, KPC began vigorous efforts to cut timber in order to qualify for an extension and made substantial progress toward harvesting and road building.

10. Mr. Edgars of the Forest Service attempted to contact Mr. Trout of Cape Fox several times but got no reply. A meeting in December, 1974 was finally held between Mr. Trout and Mr. Chelstad, a Ketchikan Area Timber Management Officer, to discuss the extension and modification of the timber sale contract. Mr. Trout was informed that Devil's Club was within the Cape Fox selection area.

11. On August 13, 1974, KPC and the Forest Service met, and the Forest Service informed KPC that the Devil's Club was within the Cape Fox selection area and that the extension depended in part on limiting the cut to environmentally specified areas. KPC was told to limit its operations so that meaningful environmental review was possible.

12. On August 23, 1974, the Forest Service wrote Alaska Timber Corporation and advised them that the contract area was within the Cape Fox selection area, that environmental considerations would change the size of the clear cut units and reduce the total volume upon final extension, and that it should confine its harvest to particular areas and a failure to do so would result in a denial of the extension.

13. On November 25, 1974, ATC requested a two-year extension indicating as of October 31, 1974, 25,-000,000 board feet had been cut.

14. On December 2, 1974, a letter was sent by Forest Supervisor Richard Wilson to Cape Fox, informing plaintiff that the contract would probably be extended.

15. On December 12, 1974, Cape Fox submitted its selection application pursuant to ANCSA, which included the Devil's Club Sale area and the Ward Creek Drainage Tract.

16. On December 23, 1974, ATC was sent a form to conditionally extend the contract for a short period to allow the environmental modification to be completed. No timber was to be cut until the contract was finally extended.

17. On December 26, 1974, Sealaska Corporation, for itself and Cape Fox, objected to the contract extension until a meeting could be conducted. Sealaska Corporation withdrew its objection after meeting with the Forest Service.

18. The contract was conditionally extended to March 31, 1975 and was then again conditionally extended to May 31, 1975. On May 2, 1975, the contract was finally extended to December 31, 1976.

19. While the environmental analysis and modification were being proposed, Mr. Edgars of the Forest Service attempted to contact Mr. Trout but was unsuccessful. On June 24, 1975, a copy of the contract was sent to Mr. Trout, and on December 3, 1975, a meeting was held between the Forest Service and Mr. Trout. Further information was sent on December 12, 1975. On January 13, 1976, plaintiff's counsel wrote to the Forest Service concerning the escrow. None of these communications objected to the environmental modification or the extension.

20. The Forest Service environmental modification was approved by the Forest Service on November 12, 1975. The modification was thought to reduce the contract size to 28,500,-000 board feet but subsequent calculations revealed that the volume of the sale was approximately 25,700,-000 board feet.

21. The final contract, including the environmental modification, was executed on December 31, 1975.

22. In a letter dated February 26, 1976, Cape Fox asked the Forest Service to substitute other timber areas for the Devil's Club area under 43 U.S.C. 1614.

23. On March 16, 1976, ATC refused to substitute timber areas and the Forest Service advised Cape Fox that substitution under 43 U.S.C. 1614 did not permit unilateral modification of contract boundaries.

24. On March 31, 1976, the Bureau of Land Management issued a decision to grant an interim conveyance to the Devil's Club area subject to the restriction of 43 U.S.C. 1621(k) for national forests and reservations by the United States. The conveyance inadvertently omitted the reservation required by 43 U.S.C. 1613(c), and Cape Fox prepared a written waiver of its right to object to the omission. Cape Fox's waiver contained a typographical error and the Bureau of Land Management refused to accept the written waiver. Further action on the decision to enter an interim conveyance halted upon the refusal of the Bureau of Land Management to accept plaintiff's oral waiver of its objection to the omission, and plaintiff's refusal to sign an easement agreement.

25. Upon conveyance, stumpage paid to the United States on the Devil's Club Timber Sale Contract after January 1, 1976 will be paid to Cape Fox under Public Law No. 94–204.

26. At a meeting on May 7, 1976, Cape Fox indicated it wanted to stop the sale. Plaintiff subsequently filed suit and sought a temporary restraining order. Judge Fitzgerald denied the request for the temporary order and later denied plaintiff's motion for a preliminary injunction.

27. On May 6, 1977, the Forest Service notified ATC that all contract requirements had been met and the contract was closed.

28. Subsequently, plaintiff filed a motion for preliminary injunction seeking conveyance of the Ward Creek Drainage Tract in order to harvest allegedly deteriorating timber."

Cape Fox has made several claims: (1) for damages exceeding $10,000 and a declaratory judgment against the United States, for a declaratory judgment against certain federal officers, and for trespass damages exceeding $10,000 and a declaratory judgment against the non-federal defendants arising out of the federal government's extension of the Devil's Club timber sale contract; for declaratory and injunctive relief against the federal defendants to preserve allegedly deteriorating timber assets in the Ward Creek Drainage Tract; and (2) for injunctive relief against the federal defendants to compel conveyance of the Devil's Club and Ward Creek Drainage Tract selections.

## JURISDICTION

■ In claims against the United States Cape Fox seeks to invoke district court jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), 5 U.S.C. §§ 701–706 (the Administrative Procedure Act), 28 U.S.C. §§ 2201, 2202 (the Declaratory Judgment Act), 28 U.S.C. § 1362 (Indian federal question jurisdiction), 28 U.S.C. § 1361 (Mandamus), and 28 U.S.C. § 1346 (the Tucker Act). In proceedings brought against the United States or its officers the plaintiff must establish not only federal court jurisdiction but must also surmount the barrier of sovereign immunity.[1]

The Claims for Damage and Declaratory Relief Against the United States Arising out of the Devil's Club Timber Sale Contract Extension

■ The threshold issue is whether the district court has jurisdiction over the claims for damages exceeding $10,000 and declaratory relief against the United States.

---

1. The absence of consent is a jurisdictional defect. *United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941); *Smith v. Grimm*, 534 F.2d 1346, 1351 n.6 (9th Cir. 1976) cert. denied 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976). See generally Wright and Miller, Federal Practice and Procedure § 3654, at 156–157 n.3 (1976).

The Tucker Act, 28 U.S.C. § 1491 [2], established court of claims jurisdiction over damage claims made against the United States exceeding $10,000.[3] The court of claims, however, has no power to grant solely equitable relief [4] and its jurisdiction is limited to actions against the United States.[5] Section 28 U.S.C. § 1346(a)(2) of the Tucker Act [6] also provides for concurrent jurisdiction in the district court over claims made against the United States not exceeding $10,000.[7] In exercising its Tucker Act jurisdiction, the district court sits as a court of claims.[8] Hence, 28 U.S.C. § 1346(a)(2) does not grant district courts jurisdiction solely for declaratory or other specific relief.[9] Although

**2.** 28 U.S.C. § 1491 provides:

The Court of Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort. For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States. To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States. In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just.

Nothing herein shall be construed to give the Court of Claims jurisdiction in suits against, or founded on actions of, the Tennessee Valley Authority, nor to amend or modify the provisions of the Tennessee Valley Authority Act of 1933, as amended, with respect to suits by or against the Authority.

**3.** See generally Wright and Miller, Federal Practice and Procedure § 3657, at 214, 218 (1976).

**4.** *United States v. Testan,* 424 U.S. 392, 397, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *Richardson v. Morris,* 409 U.S. 464, 93 S.Ct. 629, 34 L.Ed.2d 647 (1973); *United States v. King,* 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969); *Glidden Co. v. Zdanok,* 370 U.S. 530, 556–557, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962).

The jurisdiction of the court of claims under 28 U.S.C. § 1491 was, however, expanded to allow incidental equitable relief, in addition to a money judgment, in the employee dismissal situation.

**5.** *United States v. Sherwood,* 312 U.S. at 588, 61 S.Ct. 767 (1940); *Myers v. United States,* 323 F.2d 580, 583 (9th Cir. 1963).

**6.** 28 U.S.C. § 1346(a)(2) provides:

Any other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort. For the purpose of this paragraph, an express or implied contract with the Army and Air Force Exchange Service, Navy Exchanges, Marine Corps Exchanges, Coast Guard Exchanges, or Exchange Councils of the National Aeronautics and Space Administration shall be considered an express or implied contract with the United States.

**7.** See generally Wright and Miller, Federal Practice and Procedure § 3657, at 215 (1976).

Where a suit for damages exceeding $10,000 is brought in district court, 28 U.S.C. § 1406(c) provides for the transfer of the case to the court of claims. See e. g. *Sherar v. Harless,* 561 F.2d 791, 794 (9th Cir. 1977). Note also that 28 U.S.C. § 1505 does not give the court of claims exclusive jurisdiction over suits by Indian groups. For example, a district court has jurisdiction over a suit by an Indian group for damages not exceeding $10,000. *Manchester Band of Pomo Indians, Inc. v. United States,* 363 F.Supp. 1238, 1242 (N.D.Ca.1973).

**8.** *Richardson v. Morris,* 409 U.S. 464, 93 S.Ct. 629, 34 L.Ed.2d 647 (1973); *United States v. Sherwood,* 312 U.S. at 591, 61 S.Ct. 767, 85 L.Ed. 1058 (1941).

**9.** See generally Wright and Miller, Federal Practice and Procedure § 3657, at 216 n.12 (1976). *Lee v. Thornton,* 420 U.S. 139, 95 S.Ct. 853, 43 L.Ed.2d 85 (1975); *Richardson v. Morris,* 409 U.S. 464, 93 S.Ct. 629, 34 L.Ed.2d 647 (1973); *Wells v. United States,* 280 F.2d 275, 277 (9th Cir. 1960).

Some courts have held that a district court's Tucker Act jurisdiction, where money damages not exceeding $10,000 are claimed, will not be impaired if equitable relief is also sought. *Wiren v. Eide,* 542 F.2d 757, 765 n.10 (9th Cir.

the Tucker Act does not provide district court jurisdiction for equitable relief, that remedy is available in district court on other independent jurisdictional grounds.[10]

■ The difficult question presented in the present case is whether the district court has jurisdiction over claims against the United States for both money damages exceeding $10,000 and for equitable relief. This turns on whether the claim is essentially an action for money damages exceeding $10,000 or an equitable proceeding having the incidental effect of requiring payments of money by the United States.[11] If the action is characterized as an action for money damages exceeding $10,000, the court of

claims has exclusive jurisdiction and the claim is not within 28 U.S.C. § 1346(a)(2).[12] Further, if plaintiff's claim for money damages does not fall within 28 U.S.C. § 1346(a)(2), the question arises whether there may be other independent jurisdictional grounds and waivers of sovereign immunity.

■ Mandamus, 28 U.S.C. § 1361,[13] does not in this instance provide a jurisdictional basis since mandamus is an extraordinary remedy not appropriate where an adequate remedy is otherwise available.[14] As Cape Fox may seek to recover damages in the court of claims, an adequate remedy is available.[15] Mandamus jurisdiction exists

1976). See also *Blanc v. United States*, 244 F.2d 708, 709 (2d Cir. 1957), cert. denied 355 U.S. 874, 78 S.Ct. 126, 2 L.Ed.2d 79 (1957). Wright and Miller, Federal Practice and Procedure § 3657, at 217 n.13 (1976).

10. *Lee v. Thornton*, 420 U.S. 139, 95 S.Ct. 853, 43 L.Ed.2d 85 (1975); *Richardson v. Morris*, 409 U.S. at 466, 93 S.Ct. 629 (1973).

11. *Mathias v. Laird*, 483 F.2d 943 (9th Cir. 1973); *Carter v. Seamans*, 411 F.2d 767, 771 (5th Cir. 1969), cert. denied 397 U.S. 941, 90 S.Ct. 953, 25 L.Ed.2d 121 (1970). See also *Crawford v. Cushman*, 531 F.2d 1114, 1126 n.17 (2d Cir. 1976); *Alabama Rural Fire Ins. Co. v. Naylor*, 530 F.2d 1221, 1228 (5th Cir. 1976); *Warner v. Cox*, 487 F.2d 1301, 1304 (5th Cir. 1974); *Polos v. United States*, 556 F.2d 903, 905 (8th Cir. 1977); *Sherar v. Harless*, 561 F.2d at 793 (9th Cir. 1977); *International Eng. Co., Div. of A–T–O, Inc. v. Richardson*, 512 F.2d 573, 578, 167 U.S.App.D.C. 396, 401 (1975); *Gordon v. Shoup*, 115 U.S.App.D.C. 32, 316 F.2d 683 (1963). Cf. *National Helium Corp. v. Morton*, 455 F.2d 650, 654 (10th Cir. 1971).

12. See *Alabama Rural Fire Ins. Co. v. Naylor*, 530 F.2d at 1228 (5th Cir. 1976); *Warner v. Cox*, 487 F.2d at 1304 (5th Cir. 1974); *Carter v. Seamans*, 411 F.2d at 771 (5th Cir. 1969), cert. denied 397 U.S. 941, 90 S.Ct. 953, 25 L.Ed.2d 121 (1970); *International Eng. Co., Div. of A–T–O, Inc. v. Richardson*, 167 U.S.App.D.C. 396, 512 F.2d at 578 (1975). Cf. *National Helium Corporation v. Morton*, 455 F.2d at 654 (10th Cir. 1971).
Some courts in their analysis assume that the Tucker Act, 28 U.S.C. § 1346(a)(2), provides a limited waiver of sovereign immunity. Given *United States v. Testan*, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976), this assumption is mistaken. In *United States v. Testan*, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976), the Supreme Court rejected the proposition "that

the Tucker Act fundamentally waives sovereign immunity with respect to any claim invoking a constitutional provision or a federal statute or regulation, and makes available any and all generally accepted and important forms of redress, including money damages." *Hill v. United States*, 571 F.2d 1098 at 1101 (9 Cir. 1978), quoting *United States v. Testan*, 424 U.S. at 400, 96 S.Ct. 948 (1976). Following *Testan*, in order to maintain an action against the United States for money damages in district court, or the court of claims, Congress must specifically create a substantive right to money damages against the United States and also waive sovereign immunity. These two concepts are distinct, though they do merge when there is neither a waiver of sovereign immunity nor creation of a substantive cause of action. *Hill v. United States*, 571 F.2d at 1102 n.7 (1978). Dismissal under sovereign immunity would, of course, be jurisdictional while a failure to create a cause of action would be a basis for granting a motion to dismiss for failure to state a cause of action. See e. g. *Hill v. United States*, 571 F.2d at 1102 (1978). Thus, the district court apparently would not even have jurisdiction for a claim not exceeding $10,000.

13. 28 U.S.C. § 1361 provides:
The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

14. *Wiren v. Eide*, 542 F.2d at 761 n.5 (9th Cir. 1976).

15. *Mathias v. Laird*, 483 F.2d 943 (9th Cir. 1973). See also *Warner v. Cox*, 487 F.2d at 1303 n.3 (5th Cir. 1974); *Carter v. Seamans*, 411 F.2d at 772 (5th Cir. 1969), cert. denied 397 U.S. 941, 90 S.Ct. 953, 25 L.Ed.2d 121 (1970); *McClendon v. Blount*, 452 F.2d 381, 383 (7th

only if the claim is clear and certain, and the duty of the officer is ministerial and so plainly prescribed to be free from doubt.[16] Finally, 28 U.S.C. § 1361 does not provide a waiver of sovereign immunity.[17]

▉ The Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202,[18] likewise does not provide a jurisdictional basis[19] or waive sovereign immunity.[20] The granting or denial of a declaratory judgment is a matter within the sound discretion of the court.[21] And in those instances where plaintiff has a remedy in the court of claims, allowing an action in district court would undermine the jurisdiction of the court of claims. Accordingly, district courts have refused to grant declaratory judgments in such circumstances.[22] Similarly, although 28 U.S.C. § 1331 (federal question jurisdiction) provides a jurisdictional basis, the statute does not in itself constitute a waiver of sovereign immunity.[23] The Indian federal question jurisdiction statute, 28 U.S.C. § 1362,[24] does not provide a waiver of sovereign immunity.[25] More explicitly, the Alaska Native Claims Settlement Act, 43 U.S.C. § 1601(f),[26] states that none of its provisions

Cir. 1971); *Polos v. United States*, 556 F.2d at 905 n.5 (8th Cir. 1977).

**16.** *Smith v. Grimm*, 534 F.2d at 1352 (9th Cir. 1976), cert. denied 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976); *Workman v. Mitchell*, 502 F.2d 1201, 1205 (9th Cir. 1974); *Jarrett v. Resor*, 426 F.2d 213, 216 (9th Cir. 1970). Wright and Miller, Federal Practice and Procedure § 3655, at 189 (1976).

**17.** *Smith v. Grimm*, 534 F.2d at 1352 n.9 (9th Cir. 1976), cert. denied 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976); *Scholder v. United States*, 428 F.2d 1123, 1125 (9th Cir. 1970), cert. denied 400 U.S. 942, 91 S.Ct. 240, 27 L.Ed.2d 246 (1970); *State of Washington v. Udall*, 417 F.2d 1310, 1320 n.15 (9th Cir. 1969). Cf. Wright and Miller, Federal Practice and Procedure § 3655, at 189 (1976).

**18.** 28 U.S.C. § 2201 provides:
In a case of actual controversy within its jurisdiction, except with respect to Federal taxes other than actions brought under section 7428 of the Internal Revenue Code of 1954, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.
28 U.S.C. § 2202 provides:
Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment.

**19.** *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671–672, 70 S.Ct. 876, 94 L.Ed. 1194 (1950); *Smith v. Grimm*, 534 F.2d at 1349 n.5 (9th Cir. 1976), cert. denied 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976); *Ybarra v. City of Town of Los Altos Hills*, 503 F.2d 250, 252 n.1 (9th Cir. 1974); *Workman v. Mitchell*, 502 F.2d at 1205 (9th Cir. 1974); *Jarrett v.*

*Resor*, 426 F.2d at 216 (9th Cir. 1970); *United States v. Preston*, 352 F.2d 352, 355 (9th Cir. 1965); Wright and Miller, Federal Practice and Procedure § 3655, at 173 (1976).

**20.** *White v. Administrator of General Services Admin. of United States*, 343 F.2d 444, 447 (9th Cir. 1965).

**21.** *Public Affairs Associates v. Rickover*, 369 U.S. 111, 82 S.Ct. 580, 7 L.Ed.2d 604 (1962).

**22.** *Mathias v. Laird*, 483 F.2d 943 (9th Cir. 1973). See also *Warner v. Cox*, 487 F.2d at 1303 n.3 (5th Cir. 1974); *Carter v. Seamans*, 411 F.2d at 776 (5th Cir. 1969), cert. denied 397 U.S. 941, 90 S.Ct. 953, 25 L.Ed.2d 121 (1970).

**23.** See e. g. *Smith v. Grimm*, 534 F.2d at 1351 n.6 (9th Cir. 1976), cert. denied 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976). See also *Warner v. Cox*, 487 F.2d at 1303 n.3 (5th Cir. 1974); *Polos v. United States*, 556 F.2d at 905 n.5 (8th Cir. 1977); *International Eng. Co., Div. of A–T–O, Inc. v. Richardson*, 167 U.S.App.D.C. at 403 n.10, 512 F.2d at 580 n.10 (1975). See also Wright and Miller, Federal Practice and Procedure § 3561, at 390 n.9 (1975).

**24.** 28 U.S.C. § 1362 provides:
The district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States.

**25.** *Scholder v. United States*, 428 F.2d at 1125 (9th Cir. 1970), cert. denied 400 U.S. 942, 91 S.Ct. 240, 27 L.Ed.2d 246 (1970). Wright and Miller, Federal Practice and Procedure § 3579, at 523 (1975).

**26.** 43 U.S.C. § 1601(f) provides:
no provision of this chapter shall be construed to constitute a jurisdictional act, to

are to be construed as a jurisdictional act with respect to claims extinguished by the operation of the Act or as an implied consent to sue the United States or its officers. Furthermore, the Administrative Procedure Act, 5 U.S.C. § 704,[27] does not provide jurisdiction where other adequate judicial remedies are available. Inasmuch as the Tucker Act is an adequate remedy, the Administrative Procedure Act is not applicable.[28] In any case, the Administrative Procedure Act only waives sovereign immunity in non-monetary actions.[29]

■ Thus, the court of claims has exclusive jurisdiction over the plaintiff's claim against the United States for money damages and equitable relief arising out of the Devil's Club timber sale contract extension.

The Claims for Declaratory and Injunctive Relief Against the Federal Defendants

■ I conclude that this court does have jurisdiction to consider plaintiff's claims for declaratory and injunctive relief against the federal defendants. The jurisdictional basis is provided by 28 U.S.C. § 1331, and sovereign immunity is waived by the Administrative Procedure Act, 5 U.S.C. §§ 701–706.

■ Congress in 1976 amended 28 U.S.C. § 1331 to eliminate the jurisdictional amount requirement for all federal question cases brought against the United States, a federal agency, or an official in his official capacity, subject only to legal restrictions on the availability of review.[30] The Administrative Procedure Act, 5 U.S.C. § 701 et seq., was correspondingly amended to effect a waiver of sovereign immunity so that actions of federal administrative officials might be reviewed. 5 U.S.C. § 702 now provides:

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is

---

confer jurisdiction to sue, nor to grant implied consent to Natives to sue the United States or any of its officers with respect to the claims extinguished by the operation of this chapter; and

27. 5 U.S.C. § 704 provides:

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

28. See e. g. *Warner v. Cox*, 487 F.2d at 1304 (5th Cir. 1974). See also *Ove Gustavsson Contracting Company v. Floete*, 278 F.2d 912, 914 (2d Cir. 1960); *Mohawk Airlines, Inc. v. C.A.B.*, 329 F.2d 894, 897 (D.C.1964).

29. See p. 15 infra. See e. g. *Alabama Rural Fire Insur. Co. v. Naylor*, 530 F.2d at 1228 (5th Cir. 1976); *Warner v. Cox*, 487 F.2d at 1304 (5th Cir. 1974); *International Eng. Co., Div. of A–T–O, Inc. v. Richardson*, 512 F.2d at 578 (D.C.Cir.1975).

There is nothing to support the suggestion that 28 U.S.C. § 1406(c) authorizes the splitting of a cause of action for damages exceeding $10,000 and specific relief by transferring only the damage portion of the action to the court of claims.

30. *Califano v. Sanders*, 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). See also Davis' Administrative Law of the Seventies § 23.02, at 183 (Supp.1977).

A suit filed after the amendment of the Administrative Procedure Act is still subject to pre-amendment restrictions on the availability of review. Specifically, suits are still subject to the restrictions of 5 U.S.C. § 701(a) for statutory preclusion and actions committed to agency discretion, failure to exhaust administrative remedies, lack of ripeness, and lack of standing. H.R.Rep.No.94–1656, 94th Cong., 2d Sess. 9, reprinted in [1976] U.S.Code Cong. and Admin.News pp. 6121, 6130. See also *Stickelman v. United States*, 563 F.2d 413, 415 n.2 (9th Cir. 1977).

against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided*, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

5 U.S.C. § 703 was also amended to allow plaintiffs in actions for judicial review to name the United States, an United States agency, or official as defendants if no special statutory review proceeding is applicable. The new language was added to remove the defense of sovereign immunity in actions to review federal administrative action otherwise subject to review where *nonmonetary* relief is sought.[31] There is presently a conflict between panels of the Ninth Circuit as to whether the Administrative Procedure Act's waiver of sovereign immunity applies retroactively to suits filed prior to October 21, 1976. Compare *City of Santa Clara*, 572 F.2d 660, at 678 (9 Cir. 1978) and *Hill v. United States*, 571 F.2d at 1102 (1978). I choose to follow *Hill v. United States*, 571 F.2d 1098 (9 Cir. 1978) and accordingly conclude the amendment of the Administrative Procedure Act applies retroactively to this case which was filed prior to October 21, 1976.

Thus, I find that this court has jurisdiction to consider plaintiff's claim for declaratory relief against certain federal officials arising out of the Devil's Club timber sale contract extension, for declaratory and injunctive relief against federal defendants to preserve allegedly deteriorating timber assets in the Ward Creek Drainage Tract, and for injunctive relief against federal defendants to compel conveyance of the Devil's Club and Ward Creek Drainage Tract selections.

The Trespass Claims for Damages Exceeding $10,000 and Declaratory Relief Against the Non-federal Defendants Arising Out of the Devil's Club Timber Sale Contract Extension.

 I find as well that this court has jurisdiction under 28 U.S.C. § 1331 to consider plaintiff's trespass claim against the non-federal defendants for damages exceeding $10,000 and for declaratory relief. 28 U.S.C. § 1331(a) provides:

The district courts shall have original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and arises under the Constitution, laws, or treaties of the United States except that no such sum or value shall be required in any such action brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity.

A complaint asserting a current right to possession conferred by federal law, apart from state law, is a case arising under federal law for purposes of 28 U.S.C. § 1331 and 28 U.S.C. § 1362. The well-pleaded complaint requirement is met by the allegation of a right to possession of Indian property based on federal law, and the allegation of a right to possession is not a federal issue arising solely in anticipation of a defense.[32]

---

**31.** H.R.Rep.No.94–1656, 94th Cong., 2d Sess. 3, reprinted in [1976] U.S.Code Cong. and Admin. News pp. 6121, 6122. *Hill v. United States*, 571 F.2d at 1102 (1978); *Planning Research Corp. v. Federal Power Com'n.*, 555 F.2d 970, 977 n.13 (1977). See also Davis Ad. Law of Seventies §§ 27.00–27.10, at 196 (Supp.1977).

**32.** Compare the situation where there is simply a right to possession derived from a federal grant.

*Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974) (an ejection action), discussed in Wright and Miller, Federal Practice and Procedure § 3579,

■ Even though a trespass action poses a federal question under 28 U.S.C. § 1362, that statute does not provide a jurisdictional basis for an action by an Alaska Native Claims Settlement Act corporation, such as Cape Fox Corporation. 28 U.S.C. § 1362 provides a jurisdictional basis in district court for all actions by any Indian tribe or band with a governing body recognized by the Secretary of Interior where the matter in controversy arises under the Constitution, laws, or treaties of the United States without regard to the amount in controversy.[33] The 28 U.S.C. § 1362 "arising under federal law" requirement has been interpreted to be broader than the "arising under" requirement of 28 U.S.C. § 1331. Courts have held that 28 U.S.C. § 1362 provides a jurisdictional basis whenever an Indian tribe is suing to protect federally derived property rights and the United States refuses to sue on behalf of the Indians.[34]

28 U.S.C. § 1362, however, does not allow suits by individual Indians,[35] and it applies only to suits by Indian *tribes* and *bands* with a governing body recognized by the Secretary of Interior.[36] An Indian tribe is a "body of Indians of the same or a similar race, united in a community under one leadership or government, and inhabiting a particular though sometimes ill-defined territory."[37] An Indian band is a "company of Indians not necessarily, though often, of the same race or tribe, but united under the same leadership in a common design." A band does not necessarily have a separate racial origin, but it does have leadership and concert of action.[38] In short, Indian tribes or bands are separate communities of citizens of Indian descent, possibly with a common racial origin, possessing the power of a sovereign to regulate their internal and social relations.[39]

■ The question arises whether a Native corporation organized under the Alaska Native Claims Settlement Act is a tribe or band recognized by the Secretary of Interior for purposes of 28 U.S.C. § 1362. Native residents of Native villages entitled to receive land and benefits under the Alaska Native Claims Settlement Act are required to organize as a business for profit or as a non-profit corporation under the laws of Alaska before a Native village is permitted to receive benefits.[40] Native associations in designated regions are also required to incorporate under the laws of Alaska to con-

---

at 519 (1975); *Mescalero Apache Tribe v. Burgett Floral Company*, 503 F.2d 336 (10th Cir. 1974) (trespass action).

**33.** *Scholder v. United States*, 428 F.2d at 1125 (9th Cir. 1970), cert. denied 400 U.S. 942, 91 S.Ct. 240, 27 L.Ed.2d 246 (1970); *United States v. Alpine Land and Reservoir Co.*, 431 F.2d 763 (9th Cir. 1970), cert. denied 401 U.S. 909, 91 S.Ct. 869, 27 L.Ed.2d 807 (1971); *Quinault Tribe of Indians v. Gallagher*, 368 F.2d 648 (9th Cir. 1966), cert. denied 387 U.S. 907, 87 S.Ct. 1684, 18 L.Ed.2d 626 (1967). Wright and Miller, Federal Practice and Procedure § 3579, at 521–522 (1975).

**34.** *Fort Mohave Tribe v. LaFollette*, 478 F.2d 1016, 1018 (9th Cir. 1973). Cf. Wright and Miller, Federal Practice and Procedure § 3579, at 522 (1975) (suggesting that 28 U.S.C. § 1362 actions should be limited to actions arising under federal law as defined in 28 U.S.C. § 1331).

**35.** *Quinault Tribe of Indians v. Gallagher*, 368 F.2d at 656 (9th Cir. 1966), cert. denied 387 U.S. 907, 91 S.Ct. 240, 27 L.Ed.2d 246 (1967); Wright and Miller, Federal Practice and Procedure § 3579, at 523 (1975).

**36.** *Quinault Tribe of Indians v. Gallagher*, 368 F.2d at 656 (9th Cir. 1966), cert. denied 387 U.S. 907, 91 S.Ct. 240, 27 L.Ed.2d 246 (1967).

**37.** *Montoya v. United States*, 180 U.S. 261, 266, 21 S.Ct. 358, 45 L.Ed. 521 (1901). See also *United States v. Candelaria*, 271 U.S. 432, 442, 46 S.Ct. 561, 563, 70 L.Ed. 1023 (1926); *Joint Trib. Coun. of Passamaquoddy Tribe v. Morton*, 528 F.2d 370, 377 n.8 (1st Cir. 1975). See generally Cohen, Handbook of Federal Indian Law, at 268 (1940); Maxfield, Dieterich, Trelease, Natural Resources Law on American Indian Lands, at 1 (1977).

**38.** *Montoya v. United States*, 180 U.S. at 266, 21 S.Ct. [358], at 359 (1901).

**39.** See e. g. *United States v. Mazurie*, 419 U.S. 544, 557, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975). For a comparison with statutory definitions of tribes, see 25 U.S.C. § 450b; 25 U.S.C. § 1452; 25 U.S.C. § 1603.

**40.** 43 U.S.C. § 1607(a).

duct business for profit.[41] "Natives" means both persons of one-fourth degree or more Alaska Indian, Eskimo, or Aleut blood or combination thereof but also any person who is regarded as an Alaska Native by the Native village or Native group of which he claims to be a member and whose father or mother is (or if deceased, was) regarded as Native by the village or group.[42] Thus, corporations are not necessarily composed of Natives of a certain blood composition.

More importantly, by requiring use of the corporate form, Congress did not intend to create any permanent racially defined institutions.[43] Village and regional corporations were to be organized to hold, invest, and/or distribute land, property, funds, and other rights and assets conveyed under the Alaska Native Claims Settlement Act.[44] Congress contemplated that regional and village corporations would not expend funds for purposes other than those reasonably necessary in the course of ordinary business operations.[45] Corporations organized under the Alaska Native Claims Settlement Act are business entities entitled to hold and manage Native property and do not have permanent racially defined rights, privileges, or obligations.[46] While shareholders and directors of a Native corporation suing in a non-corporate capacity could possibly be regarded as a tribe, Native corporations are not tribes or bands.[47]

In summary, I conclude that plaintiff's claims against the United States for damages and equitable relief arising out of the government's extension of the Devil's Club timber sale contract have no jurisdictional basis in district court and must be transferred to the court of claims. However, plaintiff's claims for declaratory relief against federal officers and the trespass claims against non-federal defendants arising out of the Devil's Club timber sale contract extension do have a jurisdictional basis in district court by virtue of 28 U.S.C. § 1331. The same jurisdictional basis permits this court to entertain the claims for declaratory and injunctive relief against federal defendants to preserve allegedly deteriorating assets in the Ward Creek Drainage Tract and for injunctive relief against federal defendants to compel conveyance of Devil's Club and Ward Creed Drainage Tract selections.

## SUBSTANTIVE ISSUES

The Alaska Native Claims Settlement Act, 43 U.S.C. § 1601 et seq., was enacted to settle Native aboriginal land claims.[48] Plaintiff Cape Fox Corporation is a village corporation organized pursuant to 43 U.S.C. § 1607 and is eligible to select land under 43 U.S.C. § 1615. On December 12, 1974, Cape Fox submitted its selection application, which included the Devil's Club area and the Ward Creek Drainage Tract. Both the Devil's Club and the Ward Creek Drainage Tract selections are lands within a National Forest.

There are two principal substantive issues in the instant case. First, what obligations does the United States owe to village corporations prior to actual conveyance through land selections made under the Settlement Act, or alternatively, what legal interests does a village corporation possess in selected land prior to conveyance by the federal government? Assuming pre-conveyance interests, do the Native corporate interests constitute a possessory interest in selected land sufficient to maintain a trespass action? Second, does 43 U.S.C.

---

**41.** 43 U.S.C. § 1606(d).

**42.** 43 U.S.C. § 1602(b).

**43.** 43 U.S.C. § 1601(b).

**44.** 43 U.S.C. § 1602(j); 43 U.S.C. § 1606.

**45.** H.R.Conf.Rep.No.92–746, 92d Cong., 1st Session. 37 reprinted in [1971] U.S.Code Cong. and Admin.News pp. 2247, 2250.

**46.** *Dodge v. First Wisconsin Trust Co.*, 394 F.Supp. 1124, 1127 (E.D.Wis.1975).

**47.** *United States v. State Tax Com'n of State of Miss.*, 505 F.2d 633, 637–638 (5th Cir. 1974).

**48.** For a historical perspective on the passage of the Alaska Native Claims Settlement Act, see *United States v. Atlantic Richfield Co.*, 435 F.Supp. 1009 (D.Alaska 1977).

§ 1613(b) require the Secretary of Interior to issue a patent to a village corporation for selected lands "immediately" after selection? In resolving these issues we must keep in mind that the underlying Congressional intent manifest in the Settlement Act is to assist the Alaska Native people in their bid for self-determination.

### Pre-Conveyance Duties and Interests

■■■ Congress' power to regulate commerce with Indian tribes under the United States Constitution, Article I, Section 8, includes the authority to determine when and to what extent a particular tribe should be treated as being within a federal guardianship.[49] While the relationship between the United States and Indian tribes resembles a guardian-wardship, the legal obligations of a true guardianship do not exist unless there is specific language in a treaty, statute, agreement, or order.[50] Thus, the Alaska Native Claims Settlement Act must be analyzed to determine whether a trust relationship exists between the United States and village corporations as to selected lands.[51]

43 U.S.C. § 1601(b) provides that "the settlement should be accomplished . . without creating a reservation system or

lengthy wardship or trusteeship . . . .". The legislative history furthermore clarifies any doubt that may exist about Congressional intent. H.R. 10367 § 2(3), passed by the House in October 1971, provided that the settlement was to be effected without creating any trusteeship.[52] H.R.Rep.No.92–523, 92d Cong., 1st Sess. 9, reprinted in [1971] U.S.Code Cong. and Admin.News pp. 2192, 2199, stated that the "bill [H.R. 10367] does not establish any trust relationship between the Federal Government and the Natives" and that "[a]ll conveyances of land will be in fee—not in trust." Senate bill S. 35 § 2(c)(2) also provided that no trust relationship was created by the Settlement Act.[53] S.Rep.No.92–405, 92d Cong., 1st Sess. 108 (1971) (accompanying S. 35), stated: "A major purpose of this committee and the Congress is to avoid perpetuating in Alaska the reservation and the trustee systems which has characterized the relationship of the Federal government to the Indian peoples in the contiguous 48 states". Moreover, H.R.Conf.Rep.No.92–746, 92d Cong., 1st Sess. 40, reprinted in [1971] U.S. Code Cong. and Admin.News pp. 2247, 2253 clearly states that the "lands granted by this Act are not 'in trust' . . . .".[54]

---

**49.** *United States v. Sandoval,* 231 U.S. 28, 46, 34 S.Ct. 1, 58 L.Ed. 107 (1913); *Joint Trib. Coun. of Passamaquoddy Tribe v. Morton,* 528 F.2d at 377 (1st Cir. 1975).

**50.** *Skokomish Indian Tribe v. France,* 269 F.2d 555, 560 (9th Cir. 1959). See also *Joint Trib. Coun. of Passamaquoddy Tribe v. Morton,* 528 F.2d at 379 (1st Cir. 1975); *Gila River Pima-Maricopa Indian Community v. United States,* 427 F.2d 1194, 1198 (Ct.Cl.1970), cert. denied 400 U.S. 819, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970).

**51.** Village corporations are business organizations and not tribes. See supra at 18. Thus, the general notions of guardianship do not seem to apply.

**52.** H.R. 10367 § 2(3) provided that "the settlement should be accomplished . . . without creating a reservation system or lengthy wardship or trusteeship . . .". Compare H.R. 7039 § 12(b)(1), which was rejected by the House:

Upon completion of the survey of lands selected by a Native village . . ., the Secretary promptly shall issue a patent or pat-

ents to such village to the land and all interests therein . . . Provided, That the Secretary shall hold the lands and interests in lands to which the village may be entitled in trust until such village organizes as a corporation or otherwise qualifies to own real property.

**53.** S. 35 § 2(c)(2) provided that the settlement was to be accomplished "without . . . creating a reservation system or lengthy trusteeship . . .". Compare S. 835 § 12(b)(1), which was rejected by the House.

Upon completion of the survey of lands selected by a Native village . . ., the Secretary promptly shall issue a patent or patents to such village to the land and all interests therein . . . Provided, That the Secretary shall hold the lands and interests in lands to which the village may be entitled in trust until such village organizes as a corporation or otherwise qualifies to own real property.

**54.** See also S.Conf.Rep.No.92–581, 92d Cong., 1st Sess. 40 (1971).

■ The conclusion that the Settlement Act was not intended to create a trust relationship is consistent with the Act's policy of Native self-determination.[55] This interpretation is also consistent with the 1976 amendment to the Settlement Act. Pub.L. No.94–204 § 2, which creates an escrow fund for revenues received by the United States from withdrawn land prior to conveyance. The provision explicitly states, "this section shall not be construed to create or terminate any trust relationship between the United States and any corporation or individual entitled to receive benefits under the Settlement Act."[56]

43 U.S.C. § 1621(i) provides:

Prior to a conveyance pursuant to section 1613 of this title, lands withdrawn by or pursuant to sections 1610, 1613, and 1615 of this title shall be subject to administration by the Secretary, or by the Secretary of Agriculture in the case of National Forest lands, under applicable laws and regulations, and their authority to make contracts and to grant leases, permits, rights-of-way, or easements shall not be impaired by the withdrawal.

43 U.S.C. § 1621(i) explicitly provides that the Secretary of Agriculture must administer National Forest lands withdrawn under 43 U.S.C. § 1615 prior to conveyance.[57] The legislative history also discloses that withdrawn national forest lands are to be administered by the Secretary of Agriculture prior to conveyance. H.R. 7039 § 13(b), introduced by Representative Meeds at the request of the Alaska Federation of Natives, recites that:

[p]ending the selection by a Native village or regional corporation . . ., the Secretary may take such actions as shall be necessary to administer, manage and protect such withdrawn public lands:

. . . And further provided, That the Secretary shall not, *without the consent* of the village or regional corporation for the benefit of which the land was withdrawn, issue, enter into or *renew any* lease, *contract* or permit covering withdrawn lands which will be in effect more than eighteen months after the effective date of this Act. (emphasis added).

H.R. 7039 § 13(c) stated that:

[a]fter the selection by a Native village or regional corporation . . . but before the issuance of a patent thereto . . ., such village or corporation shall have a *right to* lease or *dispose* of the lands and interests in lands so selected, including minerals . . . (emphasis added).

Significantly, the House rejected H.R. 7039 and instead enacted H.R. 10367 § 9(e) which provided:

Prior to conveyance pursuant to section 11 of lands withdrawn by this section and section 13, the withdrawn lands shall be subject to administration by the Secretary under applicable laws and regulations, and his authority to make contracts and to grant leases, permits, rights-of-way, or easements shall not be impaired by the withdrawal.

The only material change between H.R. 10367 § 9(e) and 43 U.S.C. § 1621(i) is that 43 U.S.C. § 1621(i) makes the provision applicable to National Forest lands. H.R.Rep. No.92–523, 92d Cong., 1st Sess. 7, reprinted in [1971] U.S.Code Cong. and Admin.News pp. 2192, 2197, commenting on section 9(e), noted:

None of the withdrawals will affect the authority of the Secretary to grant licenses, leases, etc., prior to an actual conveyance of the land pursuant to Section 11.

---

55. H.R.Conf.Rep.No.92–746, 92d Cong., 1st Sess., 37, reprinted in [1971] U.S.Code Cong. and Admin.News pp. 2247, 2250.

56. Cf. Pub.L.No.94–204 § 5. H.R.Rep.No.94–729, 94th Cong., 1st Sess. 24, reprinted in [1975] U.S.Code Cong. and Admin.News pp. 2376, 2390.

57. Under 43 U.S.C. § 1613(g), even after conveyance, the responsible state or federal agency must continue to administer rights existing prior to conveyance unless the agency waives administration. Furthermore, under 43 U.S.C. § 1621(k)(2), the United States must impose such conditions on the patent as are deemed necessary to assure that National Forest lands are properly managed.

Moreover, H.R.Rep.No.92–523, 92d Cong., 1st Sess. 9, reprinted in [1971] U.S.Code Cong. and Admin.News, pp. 2192, 2199 commented:

> Section 9(e) is intended to continue in effect the full authority of the Secretary of the Interior to administer the lands selected by the Natives, prior to the time of actual patent, and to execute contracts, leases, permits, rights-of-way, and easements in accordance with public land laws notwithstanding the Native selections.

The legislative history in the House of Representatives clearly discloses that all proposals which might have given Native corporations enforceable legal right in selected lands prior to conveyance were rejected. Similar proposals were offered during passage of the legislation through the Senate. S. 35 § 16(b), which was ultimately rejected, provided:

> Pending the patenting to a Village Corporation . . ., the Secretary may take such actions as shall be necessary to administer, manage, and protect such withdrawn public lands: . . . And provided further, That the Secretary shall not, without the consent of the Services Corporation, issue or enter into any lease, contract, or permit covering lands withdrawn pursuant to this Act which will be in effect more than eighteen months after the effective date of this Act. The Secretary may renew existing leases which would be in effect more than eighteen months after the effective date of this Act only if the basic lease provides for a right of renewal and then only on the terms provided in the basic lease. . . . All payments or revenues attributable to the use or other disposition of withdrawn lands later selected by a Village Corporation . . . shall be paid to the Village Corporation . . . .

More importantly, S. 835 § 13(b), which was rejected by the Senate, stated:

> *Pending the selection* by a Native village or regional corporation . . ., the Secretary may take such actions as shall

be necessary to administer, manage and protect such withdrawn public lands: . . . And provided further, That the Secretary shall not, *without the consent* of the village or regional corporation for the benefit of which the land was withdrawn, issue, enter into or *renew any* lease, *contract* or permit covering withdrawn lands which will be in effect more than eighteen months after the effective date of this Act.

(emphasis added).

S. 835 § 13(c) provided:

> *After the selection* by a Native village or regional corporation . . . *but before the issuance* of a patent thereto . . ., such village or corporation shall have a *right to* lease or *dispose* of the lands and interests in lands so selected, including minerals. . . .

(emphasis added).

Thus, 43 U.S.C. § 1621(i) requires the Secretary to manage the withdrawn and selected land prior to conveyance in accordance with applicable laws and regulations. As indicated by the rejection of H.R. 7039 § 13(b), (c) and S. 835 § 13(b), (c), Congress did not intend to provide Native corporations with the right to veto management decisions made by the United States after withdrawal and prior to selection, nor did it intend to give Native corporations a right to control the selected land prior to conveyance.

43 U.S.C. § 1621(i), however, must be read in conjunction with 43 U.S.C. § 1601(b). 43 U.S.C. § 1601(b) recites the general policy of "maximum participation by Natives in decisions affecting their rights and property". This statement of policy requires the Secretary to consult with Natives before making decisions affecting withdrawn and selected land.

43 U.S.C. § 1614 provides:

> Notwithstanding the provisions of existing National Forest timber sale contracts that are directly affected by conveyances authorized by this chapter, the Secretary of Agriculture is authorized to modify any such contract, with the con-

sent of the purchaser, by substituting, to the extent practicable, timber on other national forest lands approximately equal in volume, species, grade, and accessibility for timber standing on any land affected by such conveyances, and, on request of the appropriate Village Corporation the Secretary of Agriculture is directed to make such substitution to the extent it is permitted by the timber sale contract without the consent of the purchaser.

43 U.S.C. § 1614 apparently applies only after a conveyance which effects a timber sale contract. Moreover, the modification of the timber sale contract is permitted only upon the consent of the purchaser, or if without the consent of the purchaser, upon request of the appropriate village corporation to the extent that the timber sale contract so provides.

■ Pub.L. 94–204 § 2 provides:

(a) From and after the date of enactment of this Act, or January 1, 1976, whichever occurs first, any and all proceeds derived from contracts, leases, permits, rights-of-way, or easements pertaining to lands or resources of lands withdrawn for Native selection pursuant to the Settlement Act shall be deposited in an escrow account which shall be held by the Secretary until lands selected pursuant to that Act have been conveyed to the selecting corporation or individual entitled to receive benefits under such Act. As such withdrawn or formerly reserved lands are conveyed, the Secretary shall pay from such account the proceeds, together with interest which derive from contracts, leases, permits, rights-of-way, or easements, pertaining to such lands or resources of such lands, to the appropriate corporation or individual entitled to receive benefits under the Settlement Act. The proceeds derived from contracts, leases, permits, rights-of-way, or easements, pertaining to lands withdrawn or reserved, but not selected or elected

pursuant to such Act, shall, upon the expiration of the selection or election rights of the corporations and individuals for whose benefit such lands were withdrawn or reserved, be paid as would have been required by law were it not for the provisions of this Act.

(b) The Secretary is authorized to deposit in the Treasury of the United States the escrow account proceeds referred to in subsection (a) of this section, and the United States shall pay interest thereon semiannually from the date of deposit to the date of payment with simple interest at the rate determined by the Secretary of the Treasury to be the rate payable on short-term obligations of the United States prevailing at the time of payment: *Provided,* That the Secretary in his discretion may withdraw such proceeds from the United States Treasury and reinvest such proceeds in the manner provided by the first section of the Act of June. 24, 1938 (52 U.S.C. 1037): *Provided further,* That this section shall not be construed to create or terminate any trust relationship between the United States and any corporation or individual entitled to receive benefits under the Settlement Act.

(c) Any and all proceeds from public easements reserved pursuant to section 17(b)(3) of the Settlement Act, from or after the date of enactment of this Act, shall be paid to the grantee of such conveyance in accordance with such grantee's *proportionate share.*

Pub.L.No.94–204 § 2 creates a duty in the United States to segregate proceeds derived from withdrawn land after January 1, 1976 and places the proceeds in an escrow account. The proceeds are to be paid to the village corporation *upon conveyance* of the land. H.R.Rep.No.94–729, 94th Cong., 1st Sess. 15, reprinted in [1975] U.S.Code Cong. and Admin.News, pp. 2376, 2382, recites the Congressional intent of H.R. 6664 § 2:[58]

---

**58.** S. 1469 was passed by the Senate. The House inserted the language of H.R. 6644 in place of the provisions of S. 1469 and then passed S. 1469 as amended. The Senate passed S. 1469 as amended by the House with amendments, and the House concurred with the Senate amendments.

Section 2 contains provisions to correct ambiguities which have arisen during the implementation of the Settlement Act concerning the distribution of certain receipts and proceeds.

Subsection (a) provides the Secretary of the Interior with authority to deposit receipts derived from contracts, leases, permits, rights-of-way or easements pertaining to land or resources of land withdrawn for Native selection pursuant to the Settlement Act in an escrow account until such time as disposition is made of the land and then to transfer the receipts to the person or entity receiving title to the land. Upon the expiration of the selection rights of the Natives for whose benefit such lands were withdrawn or reserved, the proceeds from lands withdrawn but not selected are to be paid out as required under law. Subsection 2(b) provides the authority needed to pay interest on the funds held in the escrow account and to allow the Secretary of the Interior to reinvest them to obtain a higher return pursuant to the Act of June 24, 1938 (52 Stat. 1037, 25 U.S.C. 162(a)).

Despite the stricture provided in section 14(a) of the Settlement Act that patents to lands selected by Native corporations are to be conveyed "immediately after selection," delays between the selection of land by a Native corporation and the transfer of title to that corporation are unfortunately likely to occur. Several reasons for such delays, such as the absence of an easement policy, probably

will be eliminated in the near future. Others are likely to continue for the duration of the Native land selection process, in that the Bureau of Land Management appears to lack the manpower and money necessary to process expeditiously the hundreds of selection applications which it has or will soon receive from the twelve Regional Corporations and the approximately 220 Village Corporations which have qualified for benefits under the Settlement Act.

Under existing law, any funds derived from lands owned by the Federal government must be deposited in the Treasury or other appropriate depository until title passes, despite the fact that such lands may have been selected by a Native corporation. Therefore, in the absence of section 2 of H.R. 6644, no authority exists to establish an escrow fund on behalf of the Native corporations. Accordingly, these corporations could be deprived of a significant asset which they would be entitled to receive but for the existence of problems beyond their control—delays in conveying the selected land and lack of authority to protect Native proceeds in the interim. The Settlement Act vests the Secretary of the Interior with interim authority to grant leases, contracts, permits, rights-of-way, and easements on Native lands, in a growing number of situations, Native corporations have wanted the Secretary to enter into one of these arrangements, but have been forced to abandon their plans due to the lack of escrow authority.[59]

---

**59.** See also S.Rep.No.94–361, 94th Cong., 1st Sess. 10 (1975) (accompanying S. 1469):

Sections 2 and 3 are technical "housekeeping" provisions to correct ambiguities which have arisen during the implementation of the Settlement Act concerning the distribution of certain receipts and proceeds.

*Section 2.*—Subsection (a) provides the Secretary of the Interior with authority to deposit receipts derived from contracts, leases, permits, rights-of-way or easements pertaining to land or resources of land withdrawn for Native selection pursuant to the Settlement Act in an escrow account until such time as disposition is made of the land and then to transfer the receipts to the per-

son or entity receiving title to the land. Upon the expiration of the selection rights of the Natives for whose benefit such lands were withdrawn or reserved, the proceeds from lands withdrawn but not selected are to be paid out as required under law. Subsection 2(b) provides the authority needed to pay interest on the funds held in the escrow account and to allow the Secretary of the Interior to reinvest them to obtain a higher return pursuant to the Act of June 24, 1938 (52 Stat. 1037, 25 U.S.C. 162(a)).

Despite the stricture provided in section 14(a) of the Settlement Act that patents to lands selected by Native corporations are to be conveyed "immediately after selection," delays between the selection of land by a

Subsequent legislation declaring the intent of an earlier statute is entitled to great weight.[60] If it was necessary to amend the Settlement Act to give Native corporations a right to receive revenues earned from withdrawn land and then only upon conveyance, the implied intent is that there is no right to the greater interest of "ownership" of the land itself prior to conveyance without remedial action by Congress.[61]

I find the Alaska Native Claims Settlement Act does not create a trust relationship between the United States and village corporations as to withdrawn or selected lands. The Settlement Act leaves management of the withdrawn and selected lands in the hands of the federal government until conveyance, subject to Native consultation, and in some instances even provides for management after conveyance. Natives may obtain a substitution of timber sale contract lands with the consent of the purchaser or without the purchaser's consent if the contract so provides. While

Pub.L. No. 94–204 § 2 establishes an escrow account for money derived from selected lands to be transferred upon conveyance to the Native corporations, interests in the land do not vest until conveyance.

To maintain a trespass action, which involves injury to the right of possession, plaintiff must have been in actual or constructive possession of the land on which the trespass was committed.[62] Cape Fox did not have actual possession. Constructive possession exists if the plaintiff possessed title and no other person was in actual possession.[63] Prior to conveyance, Native corporations cannot maintain a trespass action based on constructive possession simply because the corporation does not obtain title until conveyance and because Ketchikan Pulp Company was in actual possession. Prior to conveyance, Native corporations have a right to be consulted about the management of selected lands, a right to substitution of timber sale contract lands under certain conditions and a right that

Native corporation and the transfer of title to that corporation are unfortunately likely to occur. Several reasons for such delays, such as the absence of an easement policy, probably will be eliminated in the near future. Others are likely to continue for the duration of the Native land selection process, in that the Bureau of Land Management appears to lack the manpower and money necessary to process expeditiously the hundreds of selection applications which it has or will soon receive from the twelve Regional Corporations and the approximately 220 Village Corporations which have qualified for benefits under the Settlement Act.

Under existing law, any funds derived from lands owned by the Federal government must be deposited in the Treasury or other appropriate depository until title passes, despite the fact that such lands may have been selected by a Native corporation. Therefore, in the absence of section 2 of S. 1469, no authority exists to establish an escrow fund on behalf of the Native corporations. Accordingly, these corporations could be deprived of a significant asset which they would be entitled to receive but for the existence of problems beyond their control—delays in conveying the selected land and lack of authority to protect Native proceeds in the interim. The Settlement Act vests the Secretary of the Interior with interim authority to grant leases, contracts, permits, rights-of-way, and easements on Native lands. In a

growing number of situations, Native corporations have wanted the Secretary to enter into one of these arrangements, but have been forced to abandon their plans due to the lack of escrow authority.

**60.** *N.L.R.B. v. Bell Aerospace Co.,* 416 U.S. 267, 275, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974); *Glidden Co. v. Zdanok,* 370 U.S. 530, 541, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962); *Federal Housing Administration v. The Darlington, Inc.,* 358 U.S. 84, 90, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958).

**61.** Compare 43 U.S.C. § 1613(g) which makes conveyances subject to valid existing rights. 43 U.S.C. § 1613(g) does not create preconveyance rights in Natives or Native rights upon conveyance. Note also that 43 U.S.C. § 1613(b) gives Natives a right to "immediate" conveyance but does not create rights prior to conveyance.

**62.** See generally Restatement of Torts (Second) § 157 (1965); Prosser, The Law of Torts § 13, at 68–69 (4th ed. 1971); See also 75 Am.Jur.2d Trespass § 22–24, at 24–26 (1974).

**63.** Restatement of Torts (Second) § 157(c) (1965); Prosser, The Law of Torts § 13, at 68–69 n. 65 (4th ed. 1971); 75 Am.Jur.2d Trespass § 24, at 25 (1974). See e. g. *Littleton v. Roberts,* 181 S.C. 303, 187 S.E. 349 (1936).

money derived from withdrawn land be separated into an escrow account and distributed upon conveyance. Title, however, to Native selected lands remains in the United States prior to conveyance.

This construction is consistent with other provisions of the Settlement Act. For example, the Secretary of Interior is required to consult with the State and the Land Use Planning Commission to reserve such easements as the Secretary deems necessary before issuing any patent.[64] If title passed immediately upon selection, the Secretary would be unable to fulfill his duty of reserving appropriate easements.

### Right to Compel Conveyance

43 U.S.C. § 1613(b) provides:

Immediately after selection by any Village Corporation for a Native village listed in section 1615 of this title which the Secretary finds is qualified for land benefits under this chapter, the Secretary shall issue to the Village Corporation a patent to the surface estate to 23,040 acres. The lands patented shall be the lands within the township or townships that enclose the Native village, and any additional lands selected by the Village Corporation from the surrounding townships withdrawn for the Native village by section 1615(a) of this title.

Cape Fox argues that "immediately" should be construed literally. The United States, on the other hand, argues that "immediately" must be interpreted to mean within a reasonable time under the circumstances. The issue is one of statutory construction. In this circuit the "plain meaning" rule which was formerly adhered to precluded the use of extrinsic evidence to determine the meaning of a statute clear on its face. However, the circuit presently has adopted a more flexible rule requiring consideration of relevant extrinsic evidence even if the words of the statute might appear clear upon superficial examination.[65]

As previously noted, subsequent legislation declaring the intent of an earlier statute is entitled to great weight. In addition, each part of a statute must be construed with every other part to produce a harmonious whole.[66] Great weight must be given to an agency's interpretation of a statute where the agency has the principal responsibility for administration of the act.[67] This is especially true where the statute has been recently enacted and the agency's officers played an important role in the statute's drafting and consideration.[68] Similarly, deference is due to an agency's construction of its own regulations,[69] and "great deference" should be accorded to an agency's interpretation of its own guidelines even though guidelines are not regulations.[70]

Pub.L.No.94–204 § 2 amended the Settlement Act to require the government to separate revenues generated from withdrawn land into an escrow account to be distributed upon conveyance. The provision was passed with a recognition that the Settlement Act provided for "immediate" conveyance after selection and that instantaneous conveyance was not possible:

Despite the stricture provided in section 14(a) of the Settlement Act that patents to lands selected by Native corporations are to be conveyed "immediately

---

**64.** 43 U.S.C. § 1616(b)(3). See also 43 U.S.C. § 1616(c).

**65.** Doyon, Ltd. v. Bristol Bay Native Corp., 569 F.2d 491, 494 (9th Cir. 1978).

**66.** Richards v. United States, 369 U.S. 1, 11, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); Doyon, Ltd. v. Bristol Bay Native Corp., 569 F.2d at 495 n. 9 (9th Cir. 1978). See generally Sutherland, Statutory Construction § 46.05, at 56 (4th ed. 1973).

**67.** Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); Doyon, Ltd. v.

Bristol Bay Native Corp., 569 F.2d at 496 (9th Cir. 1978).

**68.** Patagonia Corp. v. Bd. of Gov. of Fed. Res. Systems, 517 F.2d 803, 812 (9th Cir. 1975).

**69.** Udall v. Tallman, 380 U.S. at 16–17, 85 S.Ct. 792 (1965).

**70.** Griggs v. Duke Power Co., 401 U.S. 424, 433–434, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); People of State of Cal., etc. v. United States, 547 F.2d 1388, 1390 (9th Cir. 1977).

after selection," delays between the selection of land by a Native corporation and the transfer of title to that corporation are unfortunately likely to occur. Several reasons for such delays, such as the absence of an easement policy, probably will be eliminated in the near future. Others are likely to continue for the duration of the Native land selection process, in that the Bureau of Land Management appears to lack the manpower and money necessary to process expeditiously the hundreds of selection applications which it has or will soon receive from the twelve Regional Corporations and the approximately 220 Village Corporations which have qualified for benefits under the Settlement Act.[71]

In providing a solution other than the immediate conveyance of selected land, Congress surely must have intended to apply the reasonable time interpretation. Congress adopted the escrow mechanism to protect the contingent interests of the Native corporations in the particular tracts of withdrawn land rather than compelling immediate conveyance. A contrary interpretation would be grossly inconsistent with other statutory requirements in the Settlement Act. Further, plaintiff's interpretation would conflict with the duty to reserve easements prior to conveyance,[72] with the duty to make conveyances subject to valid existing rights,[73] and with the duty to make the patent subject to the requirements of 43 U.S.C. § 1613(c). Unless these requirements are imposed automatically by the statute, the right to impose these requirements would be lost once title passed. The agency interpretation is that these require-

ments would have to be included in the patent. In addition, the plaintiff's interpretation would be inconsistent with 43 U.S.C. § 1621(k) which requires the Secretary of Interior to make the patent for national forest lands subject to such conditions as he deems necessary to achieve the two statutorily specified purposes. The Secretary would have to make a determination of what was necessary prior to conveyance because the conditions are not imposed automatically by the statute. Finally, the requirement that notice of intention to convey be given[74] could not be satisfied under plaintiff's interpretation of 43 U.S.C. § 1613(b). The agency's interpretation is reasonable, especially given the difficulties created by the number of selections and the lack of money and manpower.[75]

Thus, 43 U.S.C. § 1613(b) does not require instantaneous conveyance after selection but rather requires conveyance within a reasonable time under the circumstances.

### Application to Devil's Club and Ward Creek Drainage Tract

#### a. Devil's Club

■ Although no general trust relationship exists between the United States and a Native corporation organized under the Settlement Act, the Secretary of Agriculture does have a duty to manage the national forest withdrawals in accordance with applicable laws and regulations, subject to consultation with the Native corporations. The Forest Service Manual in effect in 1969 when the Devil's Club timber sale contract was executed provided:[76]

---

**71.** H.R.Rep.No.94–729, 94th Cong., 1st Sess. 16, reprinted in [1975] U.S.Code Cong. and Admin.News pp. 2376, 2382. See also S.Rep. No.94–361, 94th Cong., 1st Sess. 10 (1975).

**72.** 43 U.S.C. § 1616(b)(3), (c).

**73.** 43 U.S.C. § 1613(g).

**74.** 43 C.F.R. § 2650.7.

**75.** H.R.Rep.No.94–729, 94th Cong., 1st Sess. 16, reprinted in [1975] U.S.Code Cong. and Admin.News pp. 2376, 2382; S.Rep.No.94–361, 94th Cong., 1st Sess. 10 (1975). See also *Aleut*

*Corp. v. Arctic Slope Regional Corp.*, 410 F.Supp. 1196, 1200 n. 10 (D.Alaska 1976).

**76.** The 1971 Forest Service Manual's policy was to make extensions more difficult to obtain: "As policy, extension of a contract term will be the exception rather than the rule and a timber purchaser is expected to complete all contractual obligations during the specified contract term". 1971 Forest Service Manual § 2433.12.

Note 16 U.S.C. § 476 governed the sale of national forest timber. 16 U.S.C. § 476 was repealed by the National Forest Management Act of 1976, Pub.L.No.94–588, § 13, 90 Stat.

For extension requested just prior to the termination date of a contract, a purchaser should expect to have cut at least 50 percent of the timber by the date of his application for extension and to have constructed sufficient specified roads under contract section 10–b to service at least 60% of the timber to be cut, including all roads which are planned or needed as access routes for other national forest timber, except when cutting of lesser amounts or lesser road construction is justifiable because of lowered lumber prices, reduced market demand, or other comparable developments subsequent to the contract award. Unless there are other considerations advantageous to the United States, extension applications which fail to meet this standard will not be considered. 1969 Forest Service Manual § 2433.11

. . . Ordinarily, the timber sale contract is written on the basis that time is not of the essence. The termination date is fixed when the sample contract is drafted and thus becomes a condition of sale, but contract section 5 contains certain stipulations which apply if the contract period is extended. Subject to those contract provisions (FSM 2432.24b), an extension of time may be granted by the officer approving the sale, his successor, or his superior, unless disadvantageous to the United States. 1969 Forest Service Manual § 2433.12

The consistent agency interpretation of these two provisions has been that the actual policy was to grant first extensions of timber sale contracts if the purchaser showed good faith and had a plan to complete the sale during the extension period.[77] The agency has regarded the longstanding custom as a contractual commitment.[78]

It has been noted that deference is owed to an agency's interpretation of its own guidelines. Moreover, the reasonableness of this interpretation was recognized in *Everett Plywood Corp. v. United States*, 512 F.2d 1082, 1088 (Ct.Cl.1975). In *Everett*, the court held that purchasers were entitled to a timber sale contract extension unless the extension would be to the disadvantage[79] of the United States because time was not of the essence and because the Forest Service policy of giving extensions freely was known in the trade.

■ Thus, I find the Devil's Club timber sale contract was properly extended. The Forest Service undertook to consult with the Native corporations prior to the extension. Cape Fox has no right at this time to compel a substitution of the Devil's Club timber sale lands because the purchaser has not consented to a substitution and because the timber sale contract expressly prohibits unilateral modification except in regard to rate redetermination.[80] Cape Fox will be

2958. 16 U.S.C. § 476 was repealed by National Forest Management Act of 1976, Pub.L.No. 94–588, § 14, 90 Stat. 2958. Timber sales, however, pursuant to 16 U.S.C. § 476 prior to October 22, 1976 are not invalid if sold in accordance with Forest Service practices in effect at the time of the sale. National Forest Management Act of 1976, Pub.L.No.94–588, § 15(a), 90 Stat. 2958.

77. Price Depo., P9; P14, L14–16; P52–53; P61–62; P75. Edgars Depo., P10–12; P16–18.

78. Price Depo., P14–15; P52–53; P61–62; P75.

79. The Forest Service initially required the purchaser to confine its operations to environmentally approved areas to allow the Forest Service to conduct an environmental review. The extension granted confined operations to environmentally specified areas. Plaintiff argues that the extension should have been denied because of the damage to environmental inter-

ests but United States' interests were served by the restricted extension.

80. B8.31 Completeness and Modification. The conditions of this sale are completely set forth in this contract. The contract can be modified only by written agreement of the parties, except as provided under B8.32. Forest Service agrees that upon request by Purchaser this contract shall be modified to provide for the exercise of any authority hereafter granted by law, or Regulation of the Secretary of Agriculture if such authority is then generally being applied to Forest Service timber sale contracts. Any other contractual provision in general use by Forest Service, together with compensating adjustments, may be inserted herein by agreement.

Contract modifications, redetermination of rates, and termination shall be in writing and may be made on behalf of Forest Service only

entitled to any revenues, which were generated from Devil's Club after January 1, 1976, upon conveyance. But Cape Fox cannot now maintain a trespass action because KPC has been in actual possession of the Devil's Club area and title is held by the United States. While there is no right to instantaneous conveyance after selection, the government has conceded that the Devil's Club area is ready for conveyance and will be conveyed once Cape Fox and Sealaska Regional Corporation sign an easement agreement to be then signed by the Secretary of Interior.[81]

b. Ward Creek Drainage Tract

Likewise, Cape Fox does not have a right to compel instantaneous conveyance of the Ward Creek Drainage Tract upon selection. The government has indicated that it will be ready to interim convey the Ward Creek Drainage Tract by approximately mid-November, 1978.[82] Upon execution of the easement agreement and completion of the conveyance preparations, the government intends to convey the Ward Creek Drainage Tract.

 The only question remaining is whether the timber assets are deteriorating and whether the United States has a duty to maintain the deteriorating timber assets prior to conveyance. 16 U.S.C. § 581 provides that the Secretary of Agriculture is "authorized and directed to conduct such investigations, experiments, and tests as he may deem necessary under sections 581a and 581b to 581i of this title, in order to determine, demonstrate, and promulgate the best methods of . . . protecting timber and other forest growth from fire, insects, disease, or other harmful agencies

. . .". 16 U.S.C. § 581c appropriates funds for investigation of forest insects. Moreover, the Forest Pest Control Act, §§ 1–3, 16 U.S.C. §§ 594–1, 594–2, 594–3 (1947) authorizes the Secretary of Agriculture to take measures to control infestations of forest insect pests.[83] The parties have not submitted any evidence as to the existence and extent of spruce worm infestation on the Ward Creek Drainage Tract, and accordingly, this issue may not be decided on summary judgment since an evidentiary hearing is required.

ORDER

1. Plaintiff's claim against the United States for money damages and equitable relief arising out of the Devil's Club timber sale contract extension is transferred to the court of claims;

2. Upon execution of an easement agreement, the government has agreed to interim convey the Devil's Club area and distribute any escrow funds derived from the Devil's Club area earned after January 1, 1976;

3. The trespass action against non-federal defendants arising out of the Devil's Club timber sale contract extension is dismissed;

4. Upon execution of an easement agreement and completion of the conveyance preparations, the government has agreed to an interim conveyance of the Ward Creek Drainage Tract;

5. A hearing will be held to determine the existence and extent of spruce worm infestation on the Ward Creek Drainage Tract.

by the Forest Service officer signing this contract, his successor, or superior.

B8.32 Modification Upon Rate Redetermination. In scheduled rate redeterminations, Forest Service may make modifications in minimum specifications for trees or products in Table 1, fire precautionary measures in C7.21, slash disposal in C6.7, logging methods in C6.4, and road maintenance requirements in C5.4, if such changes are reasonably necessary to protect the interest of the United States. Such modification shall be limited to requirements

generally being made in Forest Service timber sale contracts in the Region at the time of rate redetermination and which can reasonably be complied with by Purchaser. Such changes shall be reflected in the production costs of the rate redetermination.

**81.** See Allen affidavit, exhibit 1.

**82.** See Allen affidavit, exhibit 2.

**83.** See also 16 U.S.C. §§ 1604(m)(1), 1611(b).